BRENT M. RESH
(Nevada Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

JESSICA L. BLOME
(California Bar No. 314898, pro hac vice)
J. RAE LOVKO
(California Bar No. 208855, pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| WILD HORSE EDUCATION, and LAURA LEIGH, individually, and on behalf of WILD HORSE EDUCATION, TAMMI ADAMS, individually and on behalf of WILD HORSE EDUCATION, and REWILDING AMERICA NOW, a non-profit corporation,<br><br>*Plaintiffs,*<br><br>v.<br><br>U.S. DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, BILL GROFFY, Principal Deputy Director and Acting Director of the Bureau of Land Management, and JON RABY, Nevada State Director of the Bureau of Land Management,<br>*Defendants.* | Case No. 3:25-cv-00577-ART-CSD<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT: MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

To all parties and their attorneys of record:

PLEASE TAKE NOTICE that Plaintiffs WILD HORSE EDUCATION, a non-profit corporation; LAURA LEIGH, individually and on behalf of WILD HORSE EDUCATION; TAMMI ADAMS, individually and on behalf of WILD HORSE EDUCATION; and REWILDING AMERICA NOW, a non-profit corporation hereby move for summary judgment against Defendants UNITED STATES DEPARTMENT OF THE INTERIOR; BUREAU OF LAND MANAGEMENT; BILL GROFFY, Director of the Bureau of Land Management; and JON RABY, Nevada State Director of the Bureau of Land Management.

Pursuant to the court's modified scheduling order of August 4, 2026 (Dkt. 35), Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 56-1, Plaintiffs' motion is supported by the accompanying Memorandum of Points and Authorities; Declarations of Laura Leigh, Tammi Adams, and Manda Kalimian; Plaintiffs' Motion for Judicial Notice, Memorandum of Points and Authorities, and Declaration of Jessica L. Blome; the Administrative Record; and any written and oral argument and authorities that are presented at or before the hearing on this motion.

DATED: September 22, 2026, Respectfully Submitted,

*/s/ Brent M. Resh*
BRENT M. RESH
(Nev. Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

*/s/ Jessica L. Blome*
JESSICA L. BLOME (*pro hac vice*)
(California Bar No. 314898)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1
II. LEGAL FRAMEWORK ..... 2
A. Wild Free Roaming Horses and Burros Act. ..... 2
B. National Environmental Protection Act. ..... 5
C. Federal Land Policy and Management Act. ..... 7
D. Administrative Procedure Act. ..... 7
III. STATEMENT OF FACTS ..... 9
IV. ARGUMENT ..... 11
A. Plaintiffs have standing. ..... 11
1. Plaintiffs have prudential standing. ..... 11
2. Plaintiffs have standing under Article III. ..... 12
B. BLM violated the WHA as the HMAP in the HMAP/EA-FONSI is deficient. ..... 13
1. Habitat management objectives deficient. ..... 14
2. Population management objectives deficient. ..... 16
3. Monitoring plan deficient. ..... 18
4. Consideration of alternatives deficient in materiality. ..... 18
C. BLM's authorization of continued gathers after AML is achieved, without new excess-population determinations, violates the WHA and APA. ..... 19
D. The HMAP/EA-FONSI fails to conform to LUPs, in violation of FLPMA. ..... 20
E. BLM failed to take a hard look at critical impacts, violating NEPA and APA. ..... 23
1. Cumulative impacts. ..... 24
2. Wildfire and fire-fuels impacts. ..... 24
3. Improper tiering. ..... 25
4. BLM failed to establish baseline conditions, violating NEPA and APA. ..... 26
F. BLM's unreasonably narrow purpose and need statement foreclosed alternatives, in violation of NEPA and APA. ..... 27
G. BLM's scope of review exceeds its authority in violation of NEPA and APA. ..... 29
V. CONCLUSION ..... 30

## TABLE OF AUTHORITIES

**Cases**

*Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073 (9th Cir. 2013) .... 27

*Am. Horse Prot. Ass'n v. Frizzell,* 403 F. Supp. 1206 (D. Nev. 1975) .... 7, 21

*Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127 (D.D.C. 2020) .... 12

*Am. Wild Horse Campaign v. Stone-Manning,* 2024 U.S. Dist. LEXIS 152048, at *58 (D. Wyo. Aug. 14, 2024) .... 7

*Animal Prot. Inst. v. Hodel*, 860 F.2d 920 (9th Cir. 1988) .... 12

*Bark v. U.S. Forest Serv.,* 958 F.3d 865 (9th Cir. 2020) .... 23, 24

*Bd. of Cnty. Comm'rs of Rocky Mt. Wild v. United States BLM*, 584 F. Supp. 3d 949 (D. Colo. 2022) .... 12

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017) .... 12

*Citizens for Better Henderson v. Hodel*, 768 F.2d 1051 (9th Cir. 1985) .... 27

*Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402* .... 8

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987) .... 11

*Colo. Wild Horse & Burro Coalition, Inc. v. Salazar,* 639 F.Supp.2d 87 (D.D.C. 2009) .... 8

*Conservation Nw. v. Sherman*, 715 F.3d 1181 (9th Cir. 2013) .... 26

*Dahl v. Clark,* 600 F. Supp. 585 (D. Nev. 1984) .... 16

*Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002) .... 24

*Dine Citizens Against Ruining Our Env't v. Klein*, 747 F. Supp. 2d 1234 (D. Colo. 2010) .... 8

*Eagle Broad. Grp., Ltd. v. FCC*, 563 F.3d 543 (D.C. Cir. 2009) .... 8

*Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*,

729 F. App'x 287 (5th Cir. 2018) ... 12

*Envtl. Health Tr. v. FCC*,
9 F.4th 893 (D.C. Cir. 2021) ... 13

*Friends of Animals v. Sparks*,
200 F. Supp. 3d 1114 (D. Mont. 2016) ... 7, 16

*Friends of Animals v. U.S. Bureau of Land Mgmt.*,
728 F. Supp. 3d 45 (D.D.C. 2024) ... 20

*Great Basin Res. Watch v. Bureau of Land Management*,
844 F.3d 1095 (9th Cir. 2016) ... 23, 26

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) ... 13

*Healey v. McDonough*,
33 Vet. App. 312 (U.S. 2021) ... 8

*In Def. of Animals v. U.S. DOI,*
751 F.3d 1054 (9th Cir. 2014) ... 7, 8

*In Def. of Animals v. United States DOI*,
909 F.Supp.2d 1178 (E.D. Cal. 2012) ... 16

Kern *v. United States BLM*,
284 F.3d 1062 (9th Cir. 2002) ... 25

*Klamath Forest All*.,
No. 23-cv-03601-RFL, 2024 U.S. Dist. LEXIS 160369, at *4 ... 27

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
387 F.3d 989 (9th Cir. 2004) ... 24, 26

*Lands Council v. McNair,*
537 F.3d 981 (9th Cir. 2008) ... 13

*League of Wilderness Def.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060 (9th Cir. 2012) ... 27

*Leigh v. Raby*,
726 F. Supp. 3d 1207 (D. Nev. 2024) ... 2, 9, 24

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ... 12, 13

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ... 6, 23

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ... 11

*Montana v. Haaland,*
50 F.4th 1254 (9th Cir. 2022) ... 6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) .... 17

*N. Alaska Envtl. Ctr. v. U.S. DOI*,
983 F.3d 1077, 1093 (9th Cir. 2020) .... 29

*Native Ecosystems Council v. U.S. Forest Serv.*,
428 F.3d 1233 (9th Cir. 2005) .... 6, 27

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .... 8, 20, 23, 29

*Rhodes v. Johnson*,
153 F.3d 785 (7th Cir. 1998) .... 8

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989) .... 6

*United States v. Heffner*,
420 F.2d 809 (4th Cir. 1969) .... 8

*W. Rangeland Conservation Ass'n v. Zinke*,
265 F. Supp. 3d 1267 (D. Utah 2017) .... 16

*Western Watersheds Project v. Abbey*,
719 F.3d 1035 (9th Cir. 2013) .... 28, 29

*Westlands Water Dist. v. U.S. DOI*,
376 F.3d 853 (9th Cir. 2004) .... 27

*WildEarth Guardians v. Mont. Snowmobile Ass'n*,
790 F.3d 920, (9th Cir. 2015) .... 26

*WildEarth Guardians v. U.S. EPA*,
759 F.3d 1064 (9th Cir. 2014) .... 13

*WildEarth Guardians v. Zinke,*
2019 U.S. Dist. LEXIS 30357 (D. Mont. Feb. 11, 2019) .... 8

**Statutes**

16 U.S.C. § 1331 .... 1, 11

16 U.S.C. § 1332(b)(1) .... 16

16 U.S.C. § 1332(b)(2) .... 16

16 U.S.C. § 1332(c) .... 7

16 U.S.C. § 1333(a) .... 2

16 U.S.C. § 1333(b) .... 4

16 U.S.C. § 1333(b)(2) .... 19, 20

16 U.S.C. §§ 1332 .... 16

42 U.S.C. § 4321 .... 1

42 U.S.C. § 4322(2)(D) ........ 6
43 U.S.C. § 1701 ........ 2
43 U.S.C. § 1702(c) ........ 7
43 U.S.C. § 1702(h) ........ 7
43 U.S.C. § 1712(c)(1) ........ 7
43 U.S.C. § 1732 ........ 1, 12
43 U.S.C. § 1732(a) ........ 7, 20, 21
43 U.S.C. § 732 ........ 2
43 U.S.C. §§ 1701(a)(7) ........ 7
43 U.S.C. §1732(b) ........ 21
5 U.S.C. § 551 ........ 1
5 U.S.C. § 706(2) ........ 21
5 U.S.C. § 706(2)(A) ........ 8, 19
5 U.S.C. § 706(2)(C) ........ 8, 19
5 U.S.C. §706(2)(a) ........ 18

**Other Authorities**

89 Fed. Reg. 40 ........ 7
*Animal Protection Institute of America*, 109 IBLA 112 (1989) ........ 16

**Regulations**

40 C.F.R. § 1501.54 ........ 6
40 C.F.R. § 1501.6(e) ........ 6
40 C.F.R. § 1505.3 ........ 7
40 C.F.R. § 1508.1 ........ 24
40 C.F.R. § 1508.9(a)(1) ........ 6
43 C.F.R. § 1601.0-2 ........ 7
43 C.F.R. § 4.21 ........ 5
43 C.F.R. § 4.410 ........ 5
43 C.F.R. § 4.411 ........ 5
43 C.F.R. § 46.135(a) ........ 6, 25
43 C.F.R. § 4700.0-6(b) ........ 21

43 C.F.R. § 4710.2 .......... 2
43 C.F.R. § 4710.3-1 .......... 2
43 C.F.R. § 4710.4 .......... 2
43 C.F.R. § 4710.5 .......... 15, 23
43 C.F.R. § 6101.1 .......... 7
43 C.F.R. § 6101.2(b) .......... 7
43 C.F.R. § 6101.4(l) .......... 7

## I. INTRODUCTION

Plaintiffs first challenged the Bureau of Land Management (BLM)'s misguided management of wild horses in the Pancake Complex of Herd Management Areas in 2022, in a determined effort to make BLM comply with its legal obligations to ensure the well-being of the herd. After years of litigation, and a court order compelling preparation of a compliant Herd Management Area Plan, or HMAP, for the Pancake Complex, on March 4, 2025, BLM issued its Final Environmental Assessment (EA)/Finding of No Significant Impact (FONSI) for the Pancake Complex Wild Horse Gather & Herd Management Plan alongside the agency's associated Decision Record (DR). Together, this brief will refer to BLM's planning documents as the HMAP/EA-FONSI. In conflating an HMAP with BLM's authority to gather wild horses, BLM improperly bundled two separate agency actions together in violation of the Wild Free-Roaming Horses & Burros Act (WHA), 16 U.S.C. § 1331, et seq.

Whereas the WHA recognizes wild horses as "integral component(s) of the Natural System," 16 U.S.C. § 1331, the HMAP/EA-FONSI treats its management obligations as an annoying paperwork obligation that gets in the way of its political desire to remove the horses from the range altogether, contrary to Congressional intent. Indeed, the HMAP/EA-FONSI is devoid of statutory, regulatory, and policy considerations necessary to steward the horses of the Pancake Complex, and, if implemented, the HMAP/EA-FONSI threatens the rare, genetic wild horse lineages of the Medicine Hat horses, Overo Paints, and Damale curlies.

BLM's conflation of the planning process violates the WHA, 16 U.S.C. § 1331, et seq., National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1732 et seq., and the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq.

## II. LEGAL FRAMEWORK

### A. Wild Free Roaming Horses and Burros Act.

In 1971, Congress enacted the WHA, declaring that wild horses and burros "are to be considered in the areas where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331. Congress assigned WHA management responsibilities to the Bureau of Land Management (BLM). *Id;* 43 C.F.R. § 4710.2. Shortly after passage of the WHA, in 1975, BLM adopted regulations for the "management of wild horses and burros as an integral part of the natural system of the public lands under the principle of multiple use; protection of wild horses and burros from unauthorized capture, branding, harassment or death; and humane care and treatment of wild horses and burros." *See id.* at § 700.0-2. According to these regulations, BLM must designate land it intends to manage for wild horses long-term as a Herd Management Area, or HMA. 43 C.F.R. § 4710.3-1. For each HMA, BLM "shall … inventory and monitor herd and habitat characteristics." 43 C.F.R. § 4710.2. Once BLM designates an HMA, the agency "shall prepare a herd management area plan, which may cover one or more herd management areas." 43 C.F.R. § 4710.3-1. Ultimately, BLM's management of wild horses in an HMA "**shall be at the minimum level necessary** to **attain the objectives identified** in approved land use plans **and** herd management area plans." 16 U.S.C. § 1333(a) (emphasis added); 43 C.F.R. § 4710.4; *see also Leigh v. Raby* ("*Leigh I*"), 726 F. Supp. 3d 1207, 1219 (D. Nev. 2024). FLPMA, 43 U.S.C. § 732 *et seq*, and the WHA create a uniform, interdisciplinary process for creating and revising these plans. 43 U.S.C. § 1701 *et seq*.; 43 C.F.R. § 4710.3-1.

An HMAP is not defined in the WHA or its implementing regulations; however, BLM's Wild Horses and Burros Management Handbook (BLM Handbook) defines the purpose and components of an HMAP, as well as the process by which BLM creates HMAPs. PAN_01360-61; PAN_01385-93. According to the BLM Handbook, "HMAPs establish short- and long-term management and monitoring objectives for a specific [wild horse and burro] herd and its

habitat." *Id.* at 01360. "Such objectives may include objectives for herd composition, animal characteristics, and habitat development needs." *Id.*

BLM's stated goal is to manage healthy wild horse and burro populations on healthy rangelands, including prescribing management to assure such populations are in balance with other uses of lands and that a thriving natural ecological balance (TNEB) is achieved and maintained. PAN_01355. TNEB-oriented management is tied to monitoring objectives within an HMAP, as the HMAP identifies the actions to achieve herd and habitat management objectives. PAN_01360.

To develop an HMAP, BLM must first evaluate current management strategies, producing a management evaluation report (MER). *Id.* at 01386. The six "key steps" for this early evaluation are identified by BLM as: (1) review existing goals and objectives for the herd and its habitat and determine whether these have been met, partially met, or not met, with a supporting rationale; Incorporate a summary of the rationale supporting BLM's determination in the evaluation report; (2) compare and contrast existing and desired conditions for the herd and its habitat; (3) document the gaps (or differences) between the current and desired conditions(the purpose and need for action); (4) identify the possible management actions responsive to those gaps; (5) formulate a range of alternative management strategies for the herd and its habitat from the list of possible management actions (a Proposed Action and Alternatives), each alternative responsive in whole or in part to the identified issues; and (6) finalize the MER for a 30-day public scoping and comment period. *Id.* at 01386.

Once BLM evaluates its current management scheme, the HMAP must identify habitat and population management objectives for the HMA. Management objectives should be "specific, measurable, achievable/attainable, reasonable/relevant and trackable" within a specified timeframe (SMART). *Id.* at 01387-88. Habitat management objectives for an HMA may involve vegetation, trend, or key area objectives for upland vegetation or riparian plant communities within the HMA or objectives to maintain or improve the wild, free-roaming

behavior of the horse population. PAN_01388. "Site-specific objectives to improve habitat conditions (e.g., forage or water) may also be established." *Id.*

Population management objectives for an HMA "establish a framework for management of the herd over the longer term." PAN_01388. To establish population management objectives, BLM must develop a population range that is specific to each designated HMA, with the range establishing the number of adult horses that may reside within an HMA's boundary for long-term management. 16 U.S.C. § 1333(b). This population range is known as the "Appropriate Management Level," or AML, for an HMA, and it is a significant factor that BLM must consider when determining whether to gather and remove horses from an HMA. *Id.* (requiring removal of "excess" horses to attain a thriving natural ecological balance between wild horses and federal rangelands). Population management objectives, therefore, may include "when and how AML would be adjusted in the future, or when and how the population within the HMA would be gathered." PAN_01388. "Other parameters of population management include the desired age structure and sex ratio of horses, animal condition, phenotype, genetic diversity, population growth rate, or selective removal criteria." *Id.*

Once management objectives are identified, an HMAP must evaluate alternative "implementation objectives." PAN_01388. "Implementation objectives are management actions that, when implemented, are expected to make progress toward attaining the proposed habitat or population management objectives," set forth in an HMAP. *Id.* For each alternative analyzed in the HMAP, BLM must specify "(a) the proposed habitat and population management objectives, (b) the associated management actions (e.g. implementation objectives), and (c) the proposed monitoring objectives." *Id.* at 01387.

To ensure management objectives are met, BLM "shall include [in the HMAP] a resource monitoring plan and schedule that will be used to facilitate the timely and effective completion of habitat and population monitoring." PAN_01391. The HMAP should identify the specific monitoring item, the methodology to be used, the resource specialty needed to complete the

monitoring (e.g., field office WH&B specialist, rangeland management specialist, wildlife biologist, etc.), where and when monitoring should occur, as well as any actions to be taken to adjust or adapt management as needed and appropriate pending monitoring results." *Id.*

The last step in preparing an HMAP is for BLM to comply with the National Environmental Policy Act, by conducting an "an interdisciplinary, site-specific environmental analysis" of the HMAP's reasonably foreseeable environmental impacts. *Id.* at 01385; PAN_01386-87; PAN_01391. BLM may decide to gather and remove wild horses from an HMA to implement an HMAP objective or goal. *See* 43 C.F.R. § 4710.4; PAN_ 1397, 1400.[1] The decision to gather and remove horses may require a separate plan to comply with the National Environmental Policy Act (NEPA) but is effective once adopted. PAN_01397; 43 C.F.R. §§4.21, 4.410 , 4.411 .

A gather plan is the mechanism BLM uses to implement population and habitat objectives an HMAP has already established. *See* PAN_01396 (before removal, authorized officer must first make a separate determination, based on current information, "that excess animals are present and their removal is necessary to restore a TNEB and multiple-use relationship"). In preparing the site-specific environmental analysis required for that determination, BLM's own Handbook directs the authorized officer to "[t]ier the analysis to LUPs, HMAPs, or other relevant decision documents, as appropriate." PAN_01397. The Handbook confirms: LUP- and HMAP-level AML decisions inform the gather plan, which implements the population range that those documents adopt. *Id.* at 01395.

**B. National Environmental Protection Act.**

The National Environmental Policy Act (NEPA) governs decisions by BLM to adopt HMAPs and gather plans. *See* 42 U.S.C. §4321 et seq. Where an agency incorporates a referenced document into its NEPA analysis, "it must determine that the analysis and

---

[1] BLM states that "Implementation Monitoring" is a goal that helps track selected management options, answering the question, "Did we do it?" and to assure management actions are being implemented in a timely manner, "annual review is recommended." PAN_1392.

assumptions used in the referenced document are appropriate for the analysis at hand." 43 C.F.R. § 46.135(a)[2]; *see also* DOI NEPA Handbook, §§3.1, 3.2 (c)(1) (Feb. 2026), attached as Exh. A to RJN (continuing to require reevaluation of relied-upon-analyses and site-phase, or stage-specific tiering). NEPA further requires agencies to ensure "professional and scientific integrity" in the analysis they rely upon. 42 U.S.C. § 4322(2)(D). Critically, an HMAP is a planning document and is distinct from BLM's ultimate management alternative of gathering and removing wild horses from an HMA, which requires transparent, current, site-specific analysis and not general reliance on an analysis performed decades earlier, or in a different document (such as the operative HMAP). As such, a gather plan implementing the Pancake Complex must comply with NEPA's currency requirements *at the time BLM undertakes the gather.*

Indeed, NEPA will require that BLM take a "hard look" at the environmental consequences associated its gather when it decides to implement its gather plan. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989). NEPA serves the dual purpose of, first, informing agency decisionmakers of the significant environmental effects of proposed major federal actions and, second, ensuring that timely, relevant information is made available to the public so that it "may also play a role in both the decision-making process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 350 (1989); *Montana v. Haaland,* 50 F.4th 1254 (9th Cir. 2022).

To determine whether a proposed major federal action will have significant effects on the human environment, an agency may prepare an Environmental Assessment, or EA. *See* 40 C.F.R. § 1501.54. If the government makes a finding that no significant impact will occur because of proposed action, this decision must be based on a consideration of all relevant factors and supported by a convincing statement of reasons. *Marsh*, 490 U.S. at 373-74; *Montana*, 50 F.4th at 1265; *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (citing 40 C.F.R. § 1508.9(a)(1)); *see also* 40 C.F.R. § 1501.6(e). NEPA requires BLM to

---

[2] In effect at all times relevant to BLM's March 2025 HMAP/EA-FONSI decision.

implement and fulfill the mandates it assigns itself through decision records. *See* 40 C.F.R. § 1505.3, *Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1122-25 (D. Mont. 2016).

**C. Federal Land Policy and Management Act.**

The FLPMA charges BLM with managing public lands for "multiple use and sustained yield," a balance of resource uses meeting present and future needs, maintained in perpetuity. 43 U.S.C. §§ 1701(a)(7), 1702(c) , (h) , 1712(c)(1) , 1732(a) ; 43 C.F.R. § 1601.0-2. The WHA incorporates this same principle. 16 U.S.C. § 1332(c). Accordingly, BLM must weigh conservation "on par with other uses of the public lands," 89 Fed. Reg. 40, 308; 43 C.F.R. § 6101.2(b), and may not give priority to any particular use or user. Instead, BLM must account for all pertinent factors, including the relative value of competing resources. *Am. Horse Prot. Ass'n v. Frizzell,* 403 F. Supp. 1206, 1221 (D. Nev. 1975). As between wild horses and cattle, "neither... possess[es] any higher status than the other." *Id.*; *see also Am. Wild Horse Campaign v. Stone-Manning,* 2024 U.S. Dist. LEXIS 152048, at *58 (D. Wyo. Aug. 14, 2024) ("[N]o animal should be given a higher priority than another.").

This multiple-use mandate requires BLM to ground its management in rangeland health conditions. 43 C.F.R. § 6101.1; 89 Fed. Reg. 40, 308, 40, 309–10. BLM's authority "rest[s] on the agency's ability to assess land health conditions and consider those conditions when making decisions," where land health means "the degree to which the integrity of the soil, water, and ecological processes sustain habitat quality and ecosystem functions." 43 C.F.R. § 6101.4(l). That assessment must include "causal factor determinations," using available data to identify what is actually driving any failure to meet land health standards, not merely correlated with it. *Id.* §6103.1.2(f).

**D. Administrative Procedure Act.**

Because the WHA does not contain an internal standard of review, the Administrative Procedure Act (APA) governs judicial review. *In Def. of Animals v. U.S. DOI,* 751 F.3d 1054, 1061 (9th Cir. 2014). An agency's actions under the APA must be set aside if they are "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C) ." An agency's decision is arbitrary and capricious if it fails to consider important aspects of the issue before it, if it supports its decisions with explanations contrary to the evidence, or if its decision is either inherently implausible or contrary to governing law." *In Def. of Animals*, 751 F.3d at 1061.

Judicial review of arbitrary-and-capricious claims requires a "searching and careful" inquiry into the agency's factual basis. *Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402*; *see also Eagle Broad. Grp., Ltd.*

*FCC*, 563 F.3d 543, 551 (D.C. Cir. 2009). Although an agency's handbooks, manuals, and technical reference documents do not create mandatory duties, where the plain language of such documents establishes how an agency is to act, and such action does not contradict duties established by statute or regulation, the failure of an agency to abide by such plain language is arbitrary and capricious unless the agency identified a reasonable basis for this failure. *Healey v. McDonough*, 33 Vet. App. 312, 321 (U.S. 2021); *WildEarth Guardians v. Zinke,* 2019 U.S. Dist. LEXIS 30357, at *40-41 (D. Mont. Feb. 11, 2019); *Dine Citizens Against Ruining Our Env't v. Klein*, 747 F. Supp. 2d 1234, 1253 (D. Colo. 2010); *Rhodes v. Johnson*, 153 F.3d 785, 789–90 (7th Cir. 1998); *Auer v. Robbins*, 519 U.S. 452 (1997); *United States v. Heffner*, 420 F.2d 809, 811–13 (4th Cir. 1969).

Separately, under APA Section 706(2)(C), a reviewing court must set aside agency action found to be "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C); *Colo. Wild Horse & Burro Coalition, Inc. v. Salazar,* 639 F.Supp.2d 87, 95 (D.D.C. 2009). Where an agency's action is inconsistent with the terms of the statute it purports to implement, or with a binding land use plan adopted under that statute, the action exceeds the agency's authority and must be vacated. *Norton v. S. Utah Wilderness All*., 542 U.S. 55, 63–64, 69 (2004).

## III. STATEMENT OF FACTS

The Pancake Complex contains the Pancake HMA, Sand Springs West HMA, Jakes Wash HA, and Monte Cristo Wild Horse Territory (WHT). PAN_06459. The Complex consists of 1,228,739 acres, with the Pancake HMA containing 824,000 acres, the Sand Springs West HMA containing 157,436 acres, the Jakes Wash HA containing 153,663 acres, and the Monte Cristo WHT containing 93,640 acres. PAN_06461. Despite BLM's failure to create an HMAP for the Pancake Complex until 2025, since 2016, the agency has conducted multiple gathers and removed thousands of wild horses from within and outside the Complex. PAN_06462.

On May 4, 2021, BLM announced its plan to gather and remove thousands of "excess" horses from the Pancake Complex. *See Leigh v. Raby*, 726 F. Supp. 3d at 1215. Several plaintiffs, including Wild Horse Education (WHE) and Rewilding America Now (RAN), filed a lawsuit to challenge this decision. *See id.* at 1213. After the parties filed cross-motions for summary judgment, the Court found BLM had unduly delayed creating an HMAP for the Complex and ordered BLM to prepare an HMAP by March 28, 2025. *See id.* at 1231. The Court also vacated and remanded the Decision Record (along with the associated FONSI and EA) for the Pancake Complex gather plan "for the agency to reanalyze the foreseeable effects of the Gather Plan alternatives on wildfire risks in the Pancake Complex and reach a conclusion as to their significance." *Id.*

On June 13, 2024, BLM initiated public scoping for the Pancake Complex HMAP, accompanied by a Management Evaluation Report. PAN_03920-36. On July 15, 2024, Plaintiffs submitted substantive scoping comments identifying BLM's failure to (1) adequately address existing goals and objectives; (2) compare and contrast existing and desired conditions for the herd and its habitat; (3) identify management, monitoring, and implementation objectives and targets/triggers; and (4) address gather and removal objectives. PAN_04171-83. Plaintiffs requested BLM provide the underlying data supporting the MER's conclusions. *Id.* According to

BLM, scoping comments were also received from 6,000 individuals or organizations and agencies. PAN_06454.

On October 30, 2024, BLM released a Preliminary EA for the Pancake Complex Wild Gather & Herd Management Plan, NEPA# DOI-BLM-NV-L060-2024-0013-EA.[3] PAN_05796-06065. Plaintiffs, together with approximately 450 individuals, organizations, and agencies commented on the Preliminary EA. PAN_06545-65.

On March 4, 2025, BLM adopted the HMAP/EA-FONSI, approving and implementing two proposed actions. PAN_6451-54. The first action includes: (1) adopting an HMAP for the Pancake Complex incorporating "several population growth suppression methods;" (2) establishing an AML for the Sand Springs West HMA of 28–49 wild horses; (3) immediately gathering and removing excess animals to reach the low end of AML "as expeditiously as possible," through an initial gather and, if necessary, follow-up gathers; (4) conducting follow-up gathers "as promptly as appropriate;" (5) applying fertility control (vaccines and/or intrauterine devices) to released mares; and (6) maintaining a sex ratio of 60% male to 40% female. *Id.* The second action consists of capturing 100% of the excess wild horse population from within and outside the Jakes Wash HA, through one or more gathers. *Id.*

The Pancake Complex has a cumulative AML range of 361-638 wild horses. PAN_06460. The HMAP/EA-FONSI cites AML for the Pancake HMA itself as 240-493. *Id.* BLM established this number through prior, unidentified decision-making processes that were later re-affirmed through the 2008 Ely Range Management Plan (RMP). *Id.* The 2008 Ely RMP

[3] On November 27, 2024, Plaintiffs submitted extensive comments identifying that the Preliminary EA (1) improperly conflated two independent actions - adoption of an HMAP and adoption of a gather plan; (2) produced an HMAP inconsistent with BLM's own policies; (3) relied on an HMAP and EA unsubstantiated by current data; (4) failed to identify the issues necessary to guide the HMAP's scope; (5) failed to consider reasonable alternatives; (6) failed to provide meaningful public participation; and (7) failed to comply with *Leigh v. Raby*'s order requiring reanalysis of the Gather Plan alternatives' foreseeable wildfire-risk effects. Plaintiffs further noted the PEA failed to address the majority of Plaintiffs' scoping comments. PAN_06087-06105.

did not re-evaluate AML nor analyze whether the pre-existing AML of 240-493 was appropriate. *Id.*[4]

The Sand Springs West HMA's AML of 49 traces to a 1990s consent decision between BLM and ranchers, merely confirmed, not re-evaluated, by the 1997 Tonopah RMP. PAN_06461. The Monte Cristo WHT's AML of 72–96 is attributed to the 1986 Humboldt National Forest Land & RMP, but that document actually references a 1977 management plan's "stocking levels," not an independently set AML. *Id.* And the Jakes Wash HA, converted from an HMA in 2008 because BLM deemed its habitat insufficient to sustain horses, with a 2003 AML of only 1–21, continues to be managed principally for livestock and has a zero AML. *Id*

## IV. ARGUMENT

### A. Plaintiffs have standing.

The Declarations of Laura Leigh, individually and on behalf of WHE (WHE Decl.); Tammi Adams, individually and on behalf of WHE (Adams Decl.); and Manda Kalimian, individually and on behalf of Rewilding America Now (RAN Decl.), establish standing.

#### 1. Plaintiffs have prudential standing.

Under the APA, a plaintiff need only fall within the "zone of interest" protected by the statute at issue, a test that "is not meant to be especially demanding," with the benefit of any doubt going to the plaintiff. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987); *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224–25 (2012).

The WHA protects wild horses "as an integral part of the natural system of the public lands." 16 U.S.C. §1331. Plaintiffs are individuals and organizations with an interest in ensuring wild horses are treated accordingly, managed at the minimal feasible level, and managed consistent with land use plans and HMAPs. WHE Decl. ¶¶3–7; Adams Decl. ¶¶3-9; RAN Decl. ¶¶3-8. FLPMA's zone of interest likewise covers Plaintiffs' interest in BLM's management of

[4] BLM sets an AML range that is specific to each and every designated HMA, with the range establishing the number of adult horses that may reside within an HMA's boundaries for long-term management. AML is critical to BLM's management as it a significant factor that the agency is mandated to consider when determining whether or not to permanently gather and remove horses from an HMA. 16 U.S.C. §1333 (b).

public lands consistent with approved LUPs. 43 U.S.C. §1732. NEPA's zone of interest covers "detrimental effects upon a plaintiff's recreational use and aesthetic enjoyment," *Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 294–95 (5th Cir. 2018), and conservational interests, *Bd. of Cnty. Comm'rs of Rocky Mt. Wild v. United States BLM*, 584 F. Supp. 3d 949, 963 (D. Colo. 2022). Plaintiffs allege environmental, aesthetic, conservational, and scientific injuries squarely within that zone. WHE Decl. ¶¶11–19; Adams Decl. ¶¶4, 8-11; RAN Decl. ¶¶16-20. "[I]t is clear that the person who observes . . . a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist." *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 144 (D.D.C. 2020) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 566 (1992)).

**2. Plaintiffs have standing under Article III.**

Plaintiffs must show (1) injury in fact, (2) causation, and (3) redressability. *Lujan,* 504 U.S. at 560. Because "the presence of one party with standing is sufficient," *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017), Aesthetic, recreational, and conservation interests are cognizable Article III injuries, including as to wild horses specifically. *Lujan,* 504 U.S. at 562–63; *Animal Prot. Inst. v. Hodel*, 860 F.2d 920, 928 (9th Cir. 1988). Ms. Leigh has visited, observed, and documented wild horses in the Pancake Complex for seventeen years, including annually documenting the Complex's foaling season, and has suffered emotional distress witnessing injury and death among horses she recognizes during past gathers. WHE Decl. ¶¶11, 14–20. The HMAP/EA-FONSI threatens her continued enjoyment of the herd, including rare genetic lineages such as the Medicine Hat horses. *Id.* ¶¶16–18. Ms. Adams has visited the Complex on multiple occasions, most recently in 2025, and intends to continue doing so. Adams Decl. ¶9. WHE asserts associational standing through Ms. Leigh and Ms. Adams, and organizational standing in its own right: the HMAP/EA-FONSI has forced WHE to divert resources toward monitoring and responding to BLM's noncompliance that would otherwise support its research, education, and advocacy mission. WHE Decl. ¶¶4,5,

20; *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). RAN's mission includes the scientific study of wild horse genetics, and it specifically monitors the Pancake Complex herd, having aided in the 2022 rescue of three Medicine Hat horses removed from the Complex. RAN Decl. ¶¶8, 16. The HMAP/EA-FONSI's continued removal of rare genetic lineages threatens RAN's research mission and has forced it to divert resources from its scientific, artistic, and conservation work. *Id.* ¶¶16-18, 20- 21.

Plaintiffs have also suffered procedural injuries, as they submitted substantive comments on the adequacy of BLM's AML determination, the necessity of removal, and the omitted wildfire reanalysis, which BLM did not reasonably address as NEPA requires. BLM's failure impaired Plaintiffs' protected role in the decision-making process. *Lands Council v. McNair,* 537 F.3d 981, 1001 (9th Cir. 2008); *Envtl. Health Tr. v. FCC*, 9 F.4th 893, 904–10 (D.C. Cir. 2021); *see* PAN_06087-105.

Each injury is predicated on BLM's failure to comply with the WHA, FLPMA, and NEPA. Because Plaintiffs challenge protections designed to guard against precisely these harms, causation and redressability are satisfied without a showing that correcting the violation would change BLM's ultimate decision. *Lujan*, 504 U.S. at 572 n.7; *WildEarth Guardians v. U.S. EPA*, 759 F.3d 1064, 1070 (9th Cir. 2014). Vacatur of the HMAP/EA-FONSI and an injunction against its implementation until BLM complies with the WHA, FLPMA, and NEPA would directly redress each Plaintiff's injury.

**B. BLM violated the WHA as the HMAP in the HMAP/EA-FONSI is deficient.**

BLM combined an HMAP (management planning) and gather plan (action plan) into a single document, shortchanging both. PAN06456-06670. A properly developed HMAP should resolve the data and analysis deficits underlying AML before any gather is authorized, through the site-specific analysis BLM's Handbook requires. PAN_01367; PAN_01385-86; PAN_01416. Then, a gather decision should determine whether "excess" exists based on that AML together with the site-specific rangeland-health triggers the HMAP is designed to validate. PAN_01396.

Here, neither occurred. AML has not been validated through site-specific analysis. Nor has the HMAP set any definitive triggers for future action, and when Plaintiffs asked BLM how its monitoring for age distribution, conformation, riparian health, and rangeland health would "trigger (or not) the objective" or "future actions," BLM's only response, repeated across each request, pointed to the same Appendix without answering the question. PAN_06765-67. As detailed below, the result is a document that functions as a generalized gather plan with an HMAP's label.[5]

**1. Habitat management objectives deficient.**

According to the BLM's own Handbook, creating an HMAP requires setting specific short- and long-term goals for the unique HMA, which also helps track progress toward goals outlined in governing LUPs. PAN_01356-57; PAN_06459. The Pancake HMAP's habitat management objectives are not site-specific and instead rely on generalizations about horses and rangeland conditions that cannot substitute for site-specific data BLM's own Handbook requires. Before BLM may adopt habitat or population objectives, the Handbook requires that BLM prepare an MER assessing existing conditions against desired conditions for the herd and its habitat. PAN_01385-86.

Regarding forage, the HMAP contains utilization data by HMA, but contains very real gaps. PAN_06489-06491. For the Pancake HMA, BLM monitored four species and none of those included riparian species.[6] PAN_06489. BLM notes that for Sands Springs West, "signs of cattle utilization were apparent at many sites" but data does not separate use by cattle from wild horses. PAN – 06489-90. Data for the Monte Cristo WHT covered a single location and species, and BLM admits no data was collected at all in the Blackrock portion of the territory.

[5] It should be noted BLM's 2021 Gather EA consists of 58 pages of content (without appendixes), PAN_03497-03558, and BLM's 2025 HMAP/EA-FONSI consists of only 16 more pages of substance despite allegedly containing a management plan (HMAP) and an action (gather) plan. PAN_06456-06529.

[6] Examples of key riparian grasses or grass-like species in the Pancake Complex are identified as sedge, rush, spike-rush, bluegrass species, redtop (bentgrass) and timothy. PAN_06696.

PAN_06491. Nor does the record explain why observed utilization trends have changed over time. PAN_06694.

The rangeland health record fares no better. BLM's Rangeland Health Standards assessments for the Pancake HMA date 20017-2013, and for Sand Springs West HMA to 2009, over a decade stale, and even these assessments attribute any unmet standards to "a multitude of factors" which include livestock use, drought, and historical use, without allocation causation to wild horses specifically. PAN_06575-78. An MER consisting of data that is stale and undifferentiated cannot supply the current, site-specific analysis necessary to support the HMAP's habitat management objectives, much less population and removal objectives that depend on them.

BLM also fails to address ongoing water issues in the HMAP, even though its own regulations require a plan or parameters for removing livestock to preserve habitat for wild horses. 43 C.F.R. § 4710.5; PAN_01363-064. The HMAP is missing proposed water development or improvement projects, despite BLM's acknowledgment that excess numbers of horses damaged the Young Florio Spring water development. PAN_06488; PAN_06996. In the Sand Springs West HMA, horses are apparently entitled to water only when livestock are grazing. PAN_06697.[7] Water limitations affect both livestock and horses, but BLM's practice includes actively hauling water for livestock due to limitation of natural water resources and removing horses that allegedly cause degradation. PAN_06489. BLM does not address whether hauling water to sustain livestock in an area that cannot naturally support them contributes to the very forage and water deficiencies BLM attributes to wild horses, an obvious alternative explanation that is not considered, despite drought and climate change intensifying pressure on the Complex's already limited water resources. *See In Def. of Animals,* 751 F.3d at 1061 (agency action is arbitrary and capricious where it fails to consider an important aspect of the problem).

---

[7] BLM does not address repeated water issues every summer that stem from seasonal water sources such as Martiletti Springs (water pipeline and trough system), Moody Spring (fence enclosures to protect water flowing to a catch pond) and Young Florio Spring (pipeline system). PAN_06488- 06489.

**2. Population management objectives deficient.**

Before removing excess horses, BLM must determine both that "excess" horses reside in the Complex and that their removal is necessary—a necessity grounded in the animals' impact on the range and on the agency's ability to achieve and maintain a thriving natural ecological balance without removal (TNEB). 16 U.S.C. §§ 1332, 1333(b)(2); *W. Rangeland Conservation Ass'n v. Zinke*, 265 F. Supp. 3d 1267, 1282 (D. Utah 2017). To make that determination, BLM must first establish AMLs reflecting the population necessary to achieve TNEB. 16 U.S.C. §§ 1332(b)(1)-(2) . The District Court of Nevada has specifically ruled that AMLs must reflect the "optimum number of horses to be maintained" for purposes of achieving a "thriving, ecological balance." *Dahl v. Clark,* 600 F. Supp. 585, 592-95 (D. Nev. 1984). And AMLs must be based on "evidence, analysis or studies." *Id.* at 592.

BLM establishes an AML for each HMA, which sets the optimal population range of horses and burros that can live on the HMA while maintaining TNEB. *See* PAN_01416-24. "AML is a vehicle used to move towards a TNEB, and a trigger by which the BLM is alerted to address population imbalance." *See In Def. of Animals v. United States DOI*, 909 F.Supp.2d 1178, 1192 (E.D. Cal. 2012). "Without an accurate AML," BLM's duty to remove cannot be triggered because the agency cannot not properly determine that an overpopulation exists, "which is the prerequisite for removal." *Friends of Animals v. Sparks*, 200 F. Supp.3d at 1126 (D. Mont. 2016). For this reason, "an AML established purely for administrative reasons because it was the level of wild horse use at a particular point in time cannot be justified" under the WHBA. *Animal Protection Institute of America*, 109 IBLA 112, 118 (1989).

BLM's Handbook stipulates a multitiered analysis process for establishing and adjusting AMLs. PAN_01416-01424.[8] This process also requires that "an interdisciplinary and site-

[8] The first tier requires the agency to "determine whether the four essential habitat components (forage, water, cover and space) are present in sufficient amounts to sustain healthy WH&B populations and healthy rangelands over the long-term." PAN_ 01416-18. Tier 2 addresses the amount of sustainable forage available for wild horses and burros. PAN_ 01419-423. Tier 3 requires the agency to "determine whether or not the projected WH&B herd size is sufficient to maintain genetically diverse WH&B populations (i.e., avoid inbreeding depression)." *Id*

specific environmental analysis and decision process (NEPA) with public involvement is required to establish or adjust AML," and that such analysis include "an in-depth evaluation of intensive monitoring data." PAN_01367. BLM contends the AMLs for HMAs in the Pancake Complex were established and/or affirmed through prior decision-making processes, including but not necessarily limited to consent decisions, final multiple use decisions, and land use plans. *See* PAN_06673. But BLM never performed, or at least never disclosed, the site-specific, multi-year monitoring analysis its own Handbook demands.

For the Pancake HMA specifically, which alone accounts for 240 to 493 of the Complex's cumulative 361-638 AML, the HMAP/EA-FONSI states only that the range "was established through prior decision-making processes then affirmed through the 2008 Ely RMP," without identifying what those processes were or what data, if any, supported them. PAN_06460; *see also* Declaration of Jessica L. Blome, ¶4, Exh. B (wherein BLM's counsel admits BLM did not consider the documents and analysis supporting the 2008 Ely RMP when developing the HMAP, so those documents are not part of the HMAP's administrative record). In fact, the only AML component BLM traces to a specific origin is the Sand Springs West HMA's AML of 49 horses, which the HMAP/EA-FONSI admits was set not through ecological analysis but through a stipulated agreement (Consent Decision) among BLM and three livestock operators, E. Wayne Hage, Colvin and Son Cattle Co., and Russell Ranches, resolving a dispute before the Department of the Interior's Office of Hearings and Appeals. PAN_06460.

Neither AML figure satisfies the APA's requirement of a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). The Pancake HMA's reliance on the 2008 Ely RMP to establish AMLs invokes a high-level programmatic blueprint-planning document, not a site-specific, data-driven scientific analysis. The Sand Springs West HMA's negotiated settlement fares no better, it is an agreement allocating grazing interests among competing livestock permittees and is not a "site-specific environmental analysis" grounded in forage, water, or habitat data. Instead, it

reflects the competing economic interests of the parties to that proceeding, not an independent ecological determination of the number of wild horses the range can sustain in TNEB.

Whatever validity the RMP had when adopted, or the stipulation had to resolve the parties' dispute, BLM cannot rely on either alone to satisfy the Handbook's data-driven AML methodology. BLM cites nothing suggesting either number was ever tested against the intensive monitoring, utilization, or genetic-diversity data the Handbook requires. PAN_01367, PAN_01416. In comments to the Preliminary EA, Plaintiffs (and other members of the public) asked the agency to provide the site-specific documents, data, and methods purporting to constitute the landscape-level range analysis used to establish AML based on the population necessary to achieve and maintain a TNEB; BLM ignored this request. PAN_06724, PAN_06753-4. Because these Handbook provisions establish the "plain language" governing "how [BLM] is to act," BLM's failure to abide by them is arbitrary and capricious absent a reasoned basis for departure. *Healey*, 33 Vet. App. at 321.

**3. Monitoring plan deficient.**

A monitoring plan exists in form, as required by BLM's Handbook for HMAP creation, but its substance is missing. Rangeland health monitoring is "periodically as resources allow," and not tied to a defined schedule. PAN_06882; *see also* PAN_00683 (vegetative trend). Water source maintenance site visits are "as needed, throughout the year," with no defined inspection schedule. PAN_06683. This does not meet the requirement that BLM articulate an explanation rationally connecting facts to choices made. *See* 5 U.S.C. §706(2)(a).

**4. Consideration of alternatives deficient in materiality.**

In preparing an HMAP, BLM's Handbook requires the agency to "formulate a range of alternative management strategies for the herd and its habitat," with each alternative required to respond to the identified purpose and need, PAN_01386. The HMAP's alternatives provided no such range. Alternative B is described as identical to the Proposed Action "except that it includes a gelding component." PAN_06474-75. Alternative C is "[m]uch like the Proposed Action and

Alternative B," differing only in that it omits fertility control, a difference BLM concedes would simply result in "more frequent gathers and many more animals being removed over time." PAN_06497. This is not a materially different approach to managing the Complex. Alternative D applies the same gather-to-AML approach specifically to the Jakes Walsh HA. In other words, every alterative BLM considered reaches the same result, an immediate gather to AML that differs only in cosmetic details of implementation.

This is significant because the HMAP and any subsequent gather plan are two distinct, sequential decisions. *See* PAN_01394-96. According to BLM's Handbook, the HMAP is the activity plan that sets population and habitat objectives, and a gather plan is a separate implementation decision that tiers to those objectives once adopted. *Id.* A gather/removal decision has a faster effective date "upon issuance or on a date specified in the decision" *because* it is a different kind of decision than HMAP and AML decisions. PAN_01396 (emphasis added).

Here, because the gather mechanism was always going to run on its own immediate track regardless of what the HMAP's "alternatives" concluded, the alternatives analysis was not a genuine choice among different management approaches. Gathering to AML was always the outcome, and the alleged alternatives just varied the means of implementation. An HMAP whose alternatives foreclose any outcome but the one BLM already arranged to execute through a separate, immediately effective decision fails to satisfy BLM's Handbook and its adoption was arbitrary and capricious, and in excess of statutory authority. 5 U.S.C. § 706(2)(A), (C) .

**C. BLM's authorization of continued gathers after AML is achieved, without new excess-population determinations, violates the WHA and APA.**

BLM's authority to remove wild horses is not open-ended. Removal authority is triggered only once BLM determines that "an overpopulation exists" and that "action is necessary to remove excess animals." 16 U.S.C. § 1333(b)(2). Such authority extends only "so as to achieve appropriate management levels" and "until all excess animals have been removed." *Id.* Once AML is achieved, the predicate for removal has been satisfied. A new overpopulation and

necessity determination, supported by current information and renewed consultation, is required before BLM may authorize further gathers. *Id.*

The HMAP/EA-FONSI violates this limit. It authorizes an initial gather and, without committing to any new determination, "a follow-up gather or gathers... to achieve and maintain the population within AML range" for "the life of the plan." PAN_06466; PAN_06675**.** This is the same defect a court recently identified in ten-year gather decisions. *Friends of Animals v. U.S. Bureau of Land Mgmt.,* 728 F. Supp. 3d 45, 79–81 (D.D.C. 2024) (*FOA III*). There, the court stated that once low AML has been reached, "future gathers may occur only after the agency makes new overpopulation and necessity determinations, engages in or renews consultation with appropriate agencies, and commits to consider each of the sources of information listed in §1333(b)(2)." *Id.* Here, The HMAP/EA-FONSI's staged, multi-year gather authorization suffers from the identical defect as *FOA III* as it authorizes continued removals based on projected future population growth, rather than the fresh excess-population and necessity determination Section 1333(b) requires each time AML is reached. This authorization is inconsistent with the terms of the statute BLM is tasked to implement, and it is "in excess of statutory jurisdiction, authority, or limitations" and also unlawful under the APA. 5 U.S.C. § 706(2)(C); *Norton,* 542 U.S. at 63–64, 69.

**D. The HMAP/EA-FONSI fails to conform to LUPs, in violation of FLPMA.**

Under the FLPMA, BLM is required to manage public lands in accordance with land use plans developed under the Act's multiple-use and sustained-yield framework. 43 U.S.C. § 1732(a). BLM's own guidance for managing wild horses and burros describes its goal as managing "healthy WH&B populations on healthy rangelands," prescribing management "to assure WH&B populations are in balance with other uses of the public lands" such that "[TNEB] is achieved and maintained," with activities carried out "at the minimum feasible level of management necessary to attain the objectives identified in approved land use plans." PAN_01355. Additionally, wild horses and burros are to be "considered comparably with other

resource values in the formulation of [land use plans]", that is, in the same manner as livestock grazing, timber, minerals, and other resource values, rather than being subordinated to them. PAN_01356; 43 C.F.R. § 4700.0-6(b). BLM's failure to conform to applicable LUPs in managing wild horses in the Pancake Complex exceeds the authority FLPMA grants. 5 U.S.C. § 706(2).

While BLM is afforded some discretion in balancing these competing uses, if a tract of public land has been dedicated to specific uses by other provisions of law, it must be managed in accordance with those specific legal requirements. 43 U.S.C. § 1732(a). BLM's management decisions should not give priority to particular users, but instead the agency must first consider all pertinent factors, including the relative values of the various resources in particular areas. *Am. Horse Prot. Ass'n v. Frizzell*, 403 F. Supp. 1206, 1221 (D. Nev. 1975).

FLPMA further requires BLM to consider rangeland health and prevent unnecessary or undue degradation of public lands. 43 U.S.C. §1732(b). The HMAP/EA-FONSI does not conform to the governing land use plans covering the HMA: the 2008 Ely District RMP, the 1997 Tonopah RMP, and the 1986 Humboldt National Forest Land Resource Management Plan (LRMP). PAN_06482. BLM should have revisited or adjusted AML because its own monitoring data shows the habitat is not supporting current numbers. Specifically, the 2008 Ely RMP does not set a static AML number but ties that number to habitat and monitoring data. PAN_00941. The Pancake HMA's AML of 240–493 animals is defined such that "the upper level is based on available habitat," and the Ely RMP separately directs BLM to "[b]ase adjustments to appropriate management levels on monitoring data." PAN_00941-42. BLM has not done so.

BLM alleges that the Complex is not meeting Rangeland Health Standards, with wild horses identified as a contributing or sole cause. PAN_06461; PAN_06516. Nothing in the record shows BLM ever revisited the AML considering that data, as the ELY RMP requires. See

PAN_00942.[9] The HMAP/EA-FONSI's bare assertion that it "is in conformance with the 2008 Ely District RMP," is therefore unsupported. PAN_06462.

Similarly, the Tonopah RMP prescribes a specific management determination for when AML is exceeded, BLM is to "remove excess wild horses and/or burros to a point which may allow up to three years of population increase before again reaching the appropriate management level." PAN_00551. Nothing in the record shows BLM has ever managed the Sand Springs West HMA, with an AML of 49, according to that determination. *Id.;* PAN_06461. The HMAP/EA-FONSI's own population data reflect levels well outside the pattern the Tonopah RMP describes in nearly every year since 2009, with no demonstration that any prior gather's timing or scope was calibrated to the three-year buffer the RMP specifies. PAN_06689–90. BLM cannot claim conformance with a plan-mandated management cycle it has never followed.

The Humboldt LMPRP requires BLM to "[m]anage the Cherry Springs, Monte Cristo, and Quinn Wild Horse Territories in accordance with the Wild Horse and Burro Act and the approved territory plans." PAN_00089. The RMP itself set the Monte Cristo AML at 72–96 animals based specifically on range conditions. PAN_06491. BLM's own HMAP/EA-FONSI confirms that "[r]ange conditions have not improved given the number of horses occupying the area" since that AML was set, and nothing in the record shows BLM ever revisited the LRMP-derived AML considering that acknowledged lack of improvement. PAN_06491. BLM cannot claim conformance with an AML determination it has never demonstrably reassessed.

While each RMP ties conformance to a specific mechanism including habitat-based, monitoring-triggered AML review under the Ely RMP, and a defined post-gather population cycle under the Tonopah RMP, the record shows neither mechanism was ever applied to this Complex. That failure is not a matter of interpretation. BLM's monitoring data confirms the conditions that should have triggered these mechanisms were present for nearly two decades. In

[9] The RMP's Management Action WH-7 directs BLM to "[b]ase adjustments to [AML] on monitoring data and perform adjustments typically, but not exclusively, in conjunction with the watershed analysis process." PAN_00942.

fact, BLM has never identified how it attributes rangeland health deterioration between livestock and horses, the same data gap noted above, *supra,* Section A.1. That distinction is critical, because within territory designated for wild horse use, protecting horse habitat would require limiting livestock. 43 U.S.C. § 1732(a) ; 43 C.F.R. § 4710.5. Yet, the HMAP/EA-FONSI does not recognize this need, despite Plaintiffs raising this concern on two separate occasions. PAN_06375; PAN_ 06137.

BLM believes that "[w]ild horses are contributing to not meeting Rangeland Health Standards throughout most of the Pancake HMA and in some cases are the sole contributor," and that "the majority of the Pancake Complex is not meeting one or more of the Rangeland Health Standards." PAN_06461; PAN_06516. Population data spanning 2008–2024 likewise show no indication that BLM's gathers were ever calibrated to the plans' own AML-management cycles. PAN_06689–90. Nor is BLM positioned to correct course going forward. The HMAP/EA-FONSI's only commitment to verify rangeland-health conformance is "[p]eriodically as resources allow." PAN_06685. This is not the fixed, monitoring-driven review the governing plans require. Because BLM's own record confirms it never applied the AML-management mechanisms its governing plans prescribe, the HMAP/EA-FONSI does not conform to those plans, and the resulting action is outside the authority FLPMA grants, in violation of both FLPMA and the APA. *Norton*, 542 U.S. at 69.

**E. BLM failed to take a hard look at critical impacts, violating NEPA and APA.**

NEPA requires federal agencies to take a "hard look" at the environmental consequences of a proposed action before acting. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989). That review "must be based on accurate information and defensible reasoning," *Great Basin Res. Watch v. Bureau of Land Management*, 844 F.3d 1095, 1101 (9th Cir. 2016), and may not rest on "perfunctory" or "conclusory assertions" unsupported by detailed information, *Bark v. U.S. Forest Serv.,* 958 F.3d 865, 872 (9th Cir. 2020).

**1. Cumulative impacts.**

The cumulative effects analysis required by NEPA considers past, present, and reasonably foreseeable future actions that would affect the Pancake Complex. *See* 40 C.F.R. § 1508.1. BLM identifies the following past, present, and reasonably future actions: (1) issuance of multiple use decisions, (2) livestock use and grazing permits, (3) wild horse gathers, (4) mining operations (including the future construction of new mining facility), (5) recreation and OHV use, (6) wildlife guzzler construction, (7) invasive weed inventory and treatment, (7) fuel reduction treatment programs, and (8) oil and gas exploration. *See* PAN_06518-19.

BLM acknowledges that these actions impact the Complex but provides no details about any of them. See *Bark*, 958 F.3d at 872; *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 996 (9th Cir. 2004); *Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002). Nor does the analysis address the potential combined effect of these actions. See *Klamath-Siskiyou Wildlands Ctr*., 387 F.3d at 996. NEPA requires more than simply listing actions; substantive analysis must occur. Id. at 994-95.

**2. Wildfire and fire-fuels impacts.**

On remand from this Court's March 2024 order, BLM was required to "reanalyze the foreseeable effects of the Gather Plan alternatives on wildfire risks in the Pancake Complex and reach a conclusion as to their significance." *Leigh v. Raby*, 726 F. Supp. 3d at 1231. The Court found that BLM had made "no effort…to evaluate how greatly the spread of invasive plants would alter risks or how the combined effects of changes in wild horse grazing and the spread of cheatgrass would shift risk levels." *Id.* at 1224-25. BLM's HMAP/EA-FONSI repeats the same deficiency in a new form. The noxious-weeds discussion asserts, without analysis, that reduced rangeland health from continued overpopulation "would also likely increase the potential for catastrophic wildfire within the Complex," citing a general "inverse correlation between rangeland health and noxious and invasive weed population growth." PAN_06516.

BLM's Fire/Fuels section relies on general literature about grazing's relationship to fuel loads, but never connects the population levels authorized under any specific alternative to fuel loads, invasive-grass extent, fuel continuity, or resulting fire frequency or intensity. PAN_06519. For the Proposed Action, BLM states only that reducing horses to AML "could result in a theoretical increase in wildfires" in the short term and would "theoretically reduce" cheatgrass-dominated acreage in the long term, without data connecting either prediction to the specific number of horses removed. PAN_06520. For Alternatives B, C, and D, BLM performs no independent analysis at all: each is disposed of in a single sentence stating its impacts "would be similar to those of the Proposed Action." PAN_06520-06521. BLM thus assumes, rather than demonstrates, that removing horses reduces wildfire risk, and never evaluates whether a lower AML, a higher AML, or any other population-management approach would change the fire-fuels outcome.[10] The HMAP/EA-FONSI fails to supply the necessary analysis, despite Judge Du's order requiring an evaluation of combined wildfire implications of altered grazing and invasive-plant spread. Thus, BLM fails to answer the precise question the Court's remand required BLM to answer. *Leigh*, 726 F. Supp. 3d at 1231.

**3. Improper tiering.**

While agencies may tier to prior NEPA analyses, "tiering to a document that has not itself been subject to NEPA review is not permitted, for it circumvents the purpose of NEPA."[11] *Kern v. United States BLM*, 284 F.3d 1062, 1073 (9th Cir. 2002); see 43 C.F.R. § 46.135(a); Exh. A to RJN (tiered project-level documents must focus on site-, phase-, or stage-specific conditions and their reasonably foreseeable effects rather than relying solely on a broader programmatic review). NEPA compliance requires the agency to "articulate, publicly and in detail, the reasons for and likely effects of those management decisions, and to allow public comment on that articulation." *See id.* Here, in addressing AML and making determinations regarding

[10] The converse matters as well: large removals may leave additional standing fire fuels in some locations, even if reduced horse pressure improves other resource conditions.

[11] Tiering" is defined as "avoiding detailed discussion by referring to another document containing the required discussion." *Kern v. United States BLM,* 284 F.3d 1062, 1073 (9th Cir. 2002).

overpopulation, BLM tiered to documents that Plaintiffs did not undergo NEPA review. For example, BLM stated that it set AML for the Pancake HMA through "decision-making processes," but the agency did not provide any identifying information about these processes. PAN_06460. As detailed *supra*, Section B.2, moreover, the Sand Springs West AML traces to a stipulated agreement/consent decision, approved before 1994, and not to any NEPA-reviewed process. PAN_06461. BLM cannot avoid NEPA review because a decision takes the form of a consent decree where that decree effects a permanent, substantive change, and remains subject to NEPA's procedural requirements. *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1185 (9th Cir. 2013).

**4. BLM failed to establish baseline conditions, violating NEPA and APA.**

Establishing baseline conditions which exist before a project begins is "critical to any NEPA analysis," because without these conditions, "there is simply no way to determine what effect the project will have on the environment, and consequently, no way to comply with NEPA." *Great Basin Resource Watch*, 844 F.3d at 1101. BLM's NEPA review does not quantify impacts in any site-specific or meaningful way, id., and it is impossible to discern significant impacts from insignificant impacts based on that review. See PAN_06523. The HMAP/EA-FONSI's only "baseline" figures concern genetic diversity sampling and historical AML determinations, not current rangeland, forage, or water conditions in the Complex. PAN_06681, 06460. Without such a baseline, it is impossible to assess whether the Proposed Action, Alternatives B through D, or the No Action Alternative would produce any meaningfully different outcome for the resources BLM claims to be protecting. This is a defect NEPA does not tolerate. Bark, 958 F.3d at 872 (NEPA violated by "perfunctory" and "conclusory assertions"); *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925–28 (9th Cir. 2015) (NEPA violated where agency failed to provide underlying data); *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 996 (analysis inadequate when based on "generalized conclusory statements").

**F. BLM's unreasonably narrow purpose and need statement foreclosed alternatives, in violation of NEPA and APA.**

Generally, government agencies need only consider feasible alternatives that are reasonably related to the purpose and need of a proposed action. See *League of Wilderness Def.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012); *Westlands Water Dist. v. U.S. DOI*, 376 F.3d 853, 868 (9th Cir. 2004). The "existence of a viable but unexamined alternative" constitutes a violation of NEPA. *Citizens for Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985). In other words, an agency may appropriately reject an alternative if it provides an appropriate explanation as to why it was eliminated. *See Native Ecosystems Council,* 428 F.3d at 1246.

The purpose and need statement should be substantiated by evidence. *Westlands Water Dist.*, 376 F.3d at 867. Further, courts look to see whether a statement is drawn so narrowly as to prevent the decision-maker and the Court from assessing reasonable alternatives. *See Klamath Forest All.*, No. 23-cv-03601-RFL, 2024 U.S. Dist. LEXIS 160369, at *4; *Westlands Water Dist.*, 376 F.3d at 867. A statement of purpose and need "will fail if it unreasonably narrows the agency's consideration of alternatives so that the outcome is preordained."*Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1084 (9th Cir. 2013).

Here, the purpose and need statement is stated as:

> The BLM's purpose is to adopt and implement a Herd Management Area Plan (HMAP) consistent with the authority provided in 43 Code of Federal regulations 4700, restore and maintain Thriving Natural Ecological Balance (TNEB) by maintaining wild horse populations within the established AML ranges for the HMAs, and to reduce wild horse population growth rates to extend the time between gather events.
>
> The BLM's need is to prevent undue or unnecessary degradation of the public lands associated with excess wild horses, and to restore a thriving natural ecological balance and multiple-use relationship on public lands, consistent with FLPMA and the WFRHBA.

PAN_06462. As addressed above, BLM did not establish that any rangeland degradation in the Pancake Complex is associated with wild horses. By proclaiming this unsubstantiated need, the

agency crafted a narrow purpose that forecloses all alternatives except for the creation of a gather plan only, shutting the door on the required analysis. Plaintiffs directed comments to BLM regarding this problem. *See* PAN_06764. BLM responded that its Purpose and Need "adequately address the 43 C.F.R. § 4710.3-1. Herd management areas as well as being in compliance with the 1971 WFRHBA to gather and remove excess wild horses from the range in order to achieve and maintain a thriving natural ecological balance and protect the range from the deterioration associated with Wild Horses overpopulation within the complex." *Id*. This response is inadequate. It defends the purpose and need conformance with agency regulations without addressing whether the underlying need is substantiated, or why alternatives beyond a gather plan were foreclosed in an HMAP. *See Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1052 (9th Cir. 2013) (at a site-specific stage, reasonable alternatives should be considered). BLM took no action to cure this NEPA violation.

Specific to livestock, Section 2.9.7 of the HMAP/EA-FONSI disposes of the alternative by stating that reducing livestock grazing "would first require an amendment to the RMP, which is outside the scope of this EA." PAN_06483. BLM reiterated this position in response to public comment, stating that "[l]ivestock permits and their associated administrative management is outside the scope of this document," and that "[a]ny reallocation of forage between wild horses and livestock would require a land-use plan amendment." PAN_06750-51. Plaintiffs understand that some use by livestock may be warranted under BLM's multiple-use directive; however, because livestock use is among the most frequently cited causes of allotment failure to meet rangeland health standards, BLM's consideration should have been more substantive.[12]

BLM's rejection of the livestock-reduction alternative illustrates the circularity of relying on an unsubstantiated need to foreclose alternatives. BLM rejected this alternative that could have addressed the very rangeland degradation BLM invokes as its need, because allegedly doing so "would not meet the Purpose and Need for action identified in Section 1.2" and was

[12] Reliance on "severely dated information" in an analysis made decades prior "does not give adequate, accurate, and specific data" on impacts that might facilitate a reasoned decision. *W. Watersheds Project,* 719 F.3d at 1053.

"inconsistent with the Ely and Tonopah RMP." PAN_06483. Where the need itself is unsubstantiated, that need cannot be used to eliminate a viable alternative from consideration because it is not reasoned decision making. *W. Watersheds Project v. Abbey*, 719 F.3d at 1053.

As detailed supra, Section B.4, BLM's actual range of considered action alternatives fared no better and provided no meaningful choice. Where, as here, the agency's action alternatives are "virtually identical," NEPA is violated. *Id* at 1051; *Muckleshoot Indian Tribe,* 177 F.3d at 813 (NEPA violated where two action alternatives were "virtually identical").

**G. BLM's scope of review exceeds its authority in violation of NEPA and APA.**

Under 5 U.S.C. § 706(2)(C), agency action inconsistent with the scope of environmental review completed exceeds the agency's authority and requires a new or supplemental EA. *See Norton*, 542 U.S. at 72–73; *N. Alaska Envtl. Ctr. v. U.S. DOI*, 983 F.3d 1077, 1093 (9th Cir. 2020). BLM's implementation of the HMAP/EA-FONSI exceeds the scope of its NEPA review for two reasons. First, BLM's overpopulation determination was based on a finding that at least 1,104 excess wild horses exist above the low end of AML within the Pancake Complex. PAN_06461. If BLM removes more than that determined excess population, whether through the initial gather, follow-up gathers, or the ten-year maintenance-gather structure described *supra,* Section III.C above, the agency must make a new overpopulation determination and new necessity determination. *See FOA III*, 728 F. Supp. 3d at 79–81.

Second, the scope of BLM's NEPA review limits the scope of the HMAP/EA-FONSI implementation. In *Friends of Animals v. United States BLM*, the court ruled on a gather plan for the Pine Nut HMA, which BLM had adopted in 2010. No. 3:15-CV-0057-LRH-WGC, 2015 U.S. Dist. LEXIS 17575, at *2–3 (D. Nev. Feb. 11, 2015). There, the scope of the EA's analysis was the permanent removal of 67 excess wild horses, and 46 horses were gathered and removed. *Id.* at *9–10. Four years later, BLM issued a notice that it would remove an additional 200 wild horses pursuant to the 2010 plan's authorization. *Id.* at *7. The court granted plaintiffs a preliminary injunction on the ground that the proposed 2015 roundup's far greater intensity and

scope meant the 2010 EA could not justify it, and that plaintiffs were likely to succeed on their NEPA claim on this basis. *Id.* at *9–10. The same defect is present here. The HMAP/EA-FONSI's ten-year staged structure authorizes a series of future gathers adjusted to future population inventories rather than to the 1,104-animal excess population the EA analyzed. An EA analyzing the removal of a defined excess population cannot be stretched to authorize gathers of unknown future scope years later.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Summary Judgment, vacate and set aside the HMAP/EA-FONSI, enjoin Defendants from implementing the gather plan pending BLM's compliance with the WHA, FLPMA, and NEPA, and grant such other and further relief as the Court deems just and proper.

DATED: September 22, 2026,

Respectfully Submitted,

*/s/ Jessica L. Blome*
Jessica L. Blome
(Cal. Bar No. 314898, pro hac vice)
Jennifer Rae Lovko
(Cal. Bar No. 208855, pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com
rlovko@greenfirelaw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*/s/ Jessica L. Blome*

Jessica L. Blome