ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Energy & Natural Resources Division

BONNIE BALLARD, Trial Attorney
Wildlife & Marine Resources Section
BRIAN R. HERMAN, Assistant Section Chief
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Phone: (202) 532-5567 (Ballard)
Email: bonnie.m.ballard@usdoj.gov
Phone: (202) 532-3278 (Herman)
Email: Brian.Herman@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

WILD HORSE EDUCATION, and LAURA LEIGH, individually, and on behalf of WILD HORSE EDUCATION, TAMMI ADAMS, individually and on behalf of WILD HORSE EDUCATION, and REWILDING AMERICA NOW, a non-profit corporation,

*Plaintiffs,*

v.

U.S. DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, BILL GROFFY, Principal Deputy Director and Acting Director of the Bureau of Land Management, and JON RABY, Nevada State Director of the Bureau of Land Management,

*Defendants.*

Case No. 3:25-cv-00577-ART-CSD

**FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| WILD HORSE EDUCATION, and LAURA LEIGH, individually, and on behalf of WILD HORSE EDUCATION, TAMMI ADAMS, individually and on behalf of WILD HORSE EDUCATION, and REWILDING AMERICA NOW, a non-profit corporation,<br><br>*Plaintiffs,*<br><br>v.<br><br>U.S. DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, BILL GROFFY, Principal Deputy Director and Acting Director of the Bureau of Land Management, and JON RABY, Nevada State Director of the Bureau of Land Management,<br><br>*Defendants.* | Case No. 3:25-cv-00577-ART-CSD |

**FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Under Federal Rule of Civil Procedure 56 and Local Civil Rule 56-1, Federal Defendants cross-move for summary judgment in the above-captioned action. This cross-motion is based on the accompanying memorandum, the administrative record, and all argument or evidence that may be presented at any hearing on the cross-motion. For the reasons provided in the accompanying memorandum, Federal Defendants respectfully request that the Court grant their cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment.

Dated: November 3, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
United States Department of Justice
Energy & Natural Resources Division

<u>*/s/ Bonnie Ballard*</u>
BONNIE BALLARD, Trial Attorney
(MD Bar No. 2211280027)
Wildlife & Marine Resources Section
Phone: (202) 523-5567
Email: bonnie.m.ballard@usdoj.gov

BRIAN R. HERMAN, Assistant Section Chief
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Phone: (202) 532-3278
Email: Brian.Herman@usdoj.gov

*Attorneys for Defendants*

## TABLE OF CONTENTS


INTRODUCTION ..... 1

LEGAL BACKGROUND ..... 2

I. The Wild Free-Roaming Horses and Burros Act ..... 2

II. FLPMA ..... 3

III. NEPA ..... 4

FACTUAL BACKGROUND ..... 5

LEGAL STANDARD ..... 7

ARGUMENT ..... 9

I. Plaintiffs' Wild Horse Act claims fail ..... 9

A. The Pancake Complex HMAP complies with the Wild Horse Act ..... 9

i. The Pancake Complex HMAP outlines reasoned management objectives based on a robust analysis of the Complex's current conditions in accordance with agency guidance ..... 10

ii. BLM was not required to reaffirm previously established AMLs for the Pancake Complex when developing an HMAP ..... 12

B. BLM's gather plan for the Pancake Complex did not violate the Wild Horse Act ..... 13

II. BLM complied with FLPMA when the agency developed the HMAP and gather plan ..... 14

III. Plaintiffs' NEPA claims fail ..... 16

A. BLM reasonably considered cumulative impacts ..... 16

B. BLM considered a reasonable range of alternatives ..... 17

C. BLM established baseline conditions in the Pancake Complex ..... 20

D. Plaintiffs' tiering argument is misplaced ..... 21

E. Plaintiffs' scope of review argument is misplaced ..... 22

F. BLM complied with the Court's 2024 Remand Order to consider wildfire risks in the EA ..... 23

REMEDY ........................................ 24
CONCLUSION ........................................ 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Horse Prot. Ass'n, v. Watt*,
694 F.2d 1310 (D.C. Cir. 1982) .......... 2

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
462 U.S. 87 (1983) .......... 8

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*,
153 F.4th 869 (9th Cir. 2025) .......... 3, 4, 5, 7

*City of Carmel–By–The–Sea v. U.S. Dep't of Transp.*,
123 F.3d 1142 (9th Cir. 1997) .......... 17

*Colvin & Son, LLC v. Haaland*,
763 F. Supp. 3d 1176 (D. Nev. 2025) .......... 13

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) .......... 13

*Env'tl. Prot. Info. Ctr. v. U.S. Forest Serv.*,
451 F.3d 1005 (9th Cir. 2006) .......... 4

*Forest Guardians v. Animal & Plant Health Inspection Serv.*,
309 F.3d 1141 (9th Cir. 2002) .......... 2, 9

*Friends of Animals v. U.S. Bureau of Land Mgmt.*,
No. 2:16-CV-1670-SI, 2018 WL 1612836 (D. Or. Apr. 2, 2018) .......... 10

*Friends of Animals v. Burgum*,
164 F.4th 738 (9th Cir. 2026) .......... 4, 7, 17, 18, 24

*Friends of Animals v. Silvey* ,
820 F. App'x 513 (9th Cir. 2020) .......... 2, 13

*Friends of Animals v. Silvey*,
353 F. Supp. 3d 991 (D. Nev. 2018) .......... 2, 9, 13

*Friends of Animals v. U.S. Bureau of Land Mgmt.*,
548 F. Supp. 3d 39 (D.D.C. 2021) .......... 3

*Friends of Animals v. U.S. Bureau of Land Mgmt.*,
728 F. Supp. 3d 45 (D.D.C. 2024) .......... 22

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
460 F.3d 13 (D.C. Cir. 2006) .......... 2

*Great Basin Res. Watch v. U.S. Bureau of Land Mgmt.*,
844 F.3d 1095 (9th Cir. 2016) .......... 20

*In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054 (9th Cir. 2014) .......... 12, 15, 21

*Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002) .......... 4

*Leigh v. Raby*, 726 F. Supp. 3d 1207 (D. Nev. 2024).......... 3, 6, 9, 10, 15, 17, 23

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).......... 24

*N. Cascades Conservation Council v. U.S. Forest Serv.*, 136 F.4th 816 (9th Cir. 2025) .......... 8

*Occidental Eng'g Co. v. INS*, 753 F.2d 766 (9th Cir. 1985) .......... 8

*Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016) .......... 20

*Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120 (9th Cir. 2007) .......... 3

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108 (9th Cir. 2007) .......... 7

*River Runners for Wilderness v. Martin*, 593 F.3d 1064 (9th Cir. 2010) .......... 8

*Rybachek v. U.S. Env'tl. Prot. Agency,* 904 F.2d 1276 (9th Cir.1990) .......... 2

*San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 973 (9th Cir. 2014) .......... 8

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168 (2025).......... 3, 4, 5

*Wild Horse Educ. v. U.S. Dep't of the Interior*, No. 3:23-CV-00568-ART-CSD, 2025 WL 2073994 (D. Nev. July 22, 2025).......... 12, 18

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008).......... 24

**Statutes**

16 U.S.C. § 1331 .......... 2

16 U.S.C. § 1332(c) .......... 2

16 U.S.C. § 1333(a) .......... 1, 2

16 U.S.C. § 1333(b)(2) .......... 2, 18, 22

16 U.S.C. §§ 1332–33 .......... 5
16 U.S.C. §§ 1333(a), (b)(2) .......... 18
28 U.S.C. § 2401(a) .......... 13
42 U.S.C. § 4332(2)(C) .......... 4
42 U.S.C. § 4336(b)(2) .......... 4
42 U.S.C. §§ 4321, 4331 .......... 4
43 U.S.C. § 1732(a) .......... 14
43 U.S.C. §§ 1701(a)(7), 1712(a) .......... 3
43 U.S.C. §§ 1701-87 .......... 3
5 U.S.C. § 706(2)(A) .......... 7

**Regulations**

43 C.F.R. § 1610.5-3(a) .......... 3
43 C.F.R. § 4710.3-1 .......... 2, 9, 18
43 C.F.R. § 4710.5(a) .......... 11
43 CFR Part 4700 .......... 18

**Other Authorities**

90 Fed. Reg. 10610-01 (Feb. 25, 2025) .......... 4

## INTRODUCTION

The Wild Free-Roaming Horses and Burros Act of 1971 ("Wild Horse Act") requires the Bureau of Land Management ("BLM") to address the unsustainable overpopulation of wild horses and burros in the Pancake Complex located in southeastern Nevada. In accordance with its regulations, BLM developed a herd management area plan ("HMAP") for the Pancake Complex that outlines management objectives and corresponding actions to achieve those objectives for each herd management area ("HMA") within the Pancake Complex. In addition, despite past efforts, BLM determined that the number of wild horses greatly exceeds the appropriate management level ("AML") range for the Pancake Complex, which threatens not only rangeland health, but also the survival of the wild horses within the Pancake Complex as areas with higher numbers of wild horses usually coincide with low forage and water availability. As a result, BLM also authorized the removal of wild horses in excess of AML in a gather plan in compliance with the Wild Horse Act's instruction to "achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a).

As outlined below, BLM complied with all Wild Horse Act, Federal Land Policy and Management Act ("FLPMA"), and National Environmental Policy Act ("NEPA") requirements when it issued the HMAP and gather plan for the Pancake Complex. BLM conducted a reasoned analysis of the current conditions of the Pancake Complex and followed agency policy in its development of the Pancake Complex HMAP and gather plan. Moreover, BLM complied with all FLPMA and NEPA requirements. While Plaintiffs may disagree with BLM's management decisions, Plaintiffs fail to establish that BLM's decision is arbitrary and capricious, and the Court should defer to the agency's expertise. Accordingly, the Court should deny Plaintiffs' Motion for

Summary Judgment, grant this Cross-Motion for Summary Judgment, and uphold the challenged decision. [1]

## LEGAL BACKGROUND

### I. The Wild Free-Roaming Horses and Burros Act

In 1971, Congress passed the Wild Horse Act, 16 U.S.C. § 1331 *et seq.*, which directs the Secretary of the Interior to provide for the protection and management of wild horses "in the area where presently found, as an integral part of the natural system of the public lands." *Id.* § 1331. But after only a few years, the wild horse population had grown dramatically, "and action [was] needed to prevent a successful program from exceeding its goals and causing animal habitat destruction." *Am. Horse Prot. Ass'n, v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982) (citation omitted). Thus, in 1978, Congress amended the Wild Horse Act, giving the Secretary greater authority and discretion to manage and remove excess horses. *Id.* at 1316–18. Section 3 of the Wild Horse Act directs the Secretary to manage wild horses and burros "to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). "[BLM] (as the Secretary's delegate) carries out this function in localized [HMAs.]" *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 15 (D.C. Cir. 2006); *see* 16 U.S.C. § 1332(c); 43 C.F.R. § 4710.3-1. In each HMA, BLM typically establishes an AML range. *See Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1008 (D. Nev. 2018) ("BLM is given great deference [] in establishing

[1] Defendants oppose taking judicial notice of Section 3.2 of the U.S. Department of the Interior Handbook of NEPA Implementing Procedures, February 2026. The Handbook post-dates the HMAP and gather plan at issue here, which were authorized in March 2025. PAN_06455; *Rybachek v. U.S. Env'tl. Prot. Agency,* 904 F.2d 1276, 1296 (9th Cir.1990) (noting that it is not "appropriate ... to use post-decision information as a new rationalization either for sustaining or attacking the Agency's decision"). The Handbook also does not create a mandatory obligation for BLM because it does not have the force and effect of law. *See Forest Guardians v. Animals & Plant Health Inspection Serv.*, 309 F.3d 1141, 1143 (9th Cir. 2002) (per curiam) (holding that an agency manual "does not have the force of law and does not bind the agency").

AMLs…”), *aff’d*, 820 F. App’x 513 (9th Cir. 2020). If BLM determines there is an overpopulation of wild horses and burros and that action is necessary to remove them, BLM must immediately act to remove the excess animals to achieve AML. 16 U.S.C. § 1333(b)(2).

Wild Horse Act regulations also generally require that an HMAP be created for one or more HMAs. 43 C.F.R. § 4710.3-1. However, the Wild Horse Act and its implementing regulations do not prescribe what should be included in an HMAP, leaving the agency with wide discretion for what an HMAP should encompass. *See Leigh v. Raby*, 726 F. Supp. 3d 1207, 1218 (D. Nev. 2024) (noting that “[o]nly two regulations discuss HMAPs” and “[n]either lays out what comprises an HMAP, leaving that largely up to the agency to decide”), *appeal dismissed*, No. 24-3534, 2024 WL 5709632 (9th Cir. Dec. 23, 2024).

**I. FLPMA**

FLPMA establishes requirements for land use planning on public lands. 43 U.S.C. §§ 1701-87. Under FLPMA, BLM is required to “‘develop, maintain, and when appropriate, revise land use plans’ to ensure that land management be conducted ‘on the basis of multiple use and sustained yield.’” *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007) (quoting 43 U.S.C. §§ 1701(a)(7), 1712(a)). Once a land use plan is developed, “[a]ll future resource management authorizations and actions . . . shall conform to the approved plan.” 43 C.F.R. § 1610.5-3(a); *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 879 (9th Cir. 2025). Actions taken contrary to the plan can be set aside under § 706(2) of the Administrative Procedure Act (“APA”). *Id.* at 879.

Notably, HMAPs are not land use plans. *Leigh*, 726 F. Supp. 3d at 1218. Though HMAPs must be consistent with approved land use plans, HMAPs only “establish short- and long-term management and monitoring objectives for a specific . . . herd and its habitat.” *Friends of Animals*

*v. U.S. Bureau of Land Mgmt.*, 548 F. Supp. 3d 39, 47 (D.D.C. 2021) (internal quotation omitted; ellipsis in original).

## II. NEPA

NEPA is a "purely procedural" statute that "ensures that the agency and the public are aware of the environmental consequences of proposed projects." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 177 (2025); *see also* 42 U.S.C. §§ 4321, 4331. NEPA requires agencies to prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). If it is unclear whether an action will have a significant effect, an agency may first prepare an Environmental Assessment ("EA") to determine if an EIS is required. *Id.* § 4336(b)(2); *see also Friends of Animals v. Burgum*, 164 F.4th 738, 750 (9th Cir. 2026).[2] An EA is "a concise public document" that "set[s] forth the basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary." 42 U.S.C. § 4336(b)(2). If an agency concludes the proposed action has no significant effect, "it may issue a [Finding of No Significant Impact ("FONSI")] in lieu of preparing an EIS." *Env'tl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006); *see* 42 U.S.C. §§ 4336(b)(2), 4336e(7).

NEPA requires BLM "to take a 'hard look' at environmental consequences" that flow from its actions. *Friends of Animals*, 164 F.4th at 750 (quoting *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002)). But NEPA does not require BLM "to weigh environmental

[2] Even though the Council on Environmental Quality repealed its NEPA-implementing regulations in 2025, courts may look to the regulations in effect at the time if the agency relied on those regulations when it acted. *See e.g.*, 90 Fed. Reg. 10610-01 (Feb. 25, 2025); *Friends of Animals*, 164 F.4th at 750.

consequences in any particular way." *Seven Cnty.*, 605 U.S. at 173. In short, NEPA requires proper process, not a particular outcome.

"The limited scope of NEPA also circumscribes the scope of judicial review . . . . '[t]he central principle of judicial review in NEPA cases is deference.'" *Cascadia*, 153 F.4th at 880 (quoting *Seven Cnty.*, 605 U.S. at 179). Courts "should afford substantial deference" to an agency's "fact-dependent, context-specific, and policy-laden choices about the depth and breadth" of NEPA analysis. *Id.* at 903 (quoting *Seven Cnty.*, 605 U.S. at 180, 183). If the agency's actions "fall within a broad zone of reasonableness," courts have a limited, deferential role. *Id.* at 903 (citing *Seven Cnty.*, 605 U.S. at 183). This "includes deferring to the agency regarding what level of detail is required, what alternatives are feasible, and the scope of the environmental effects that the NEPA document will address." *Id.* (citing *Seven Cnty.*, 605 U.S. at 181–82).

**FACTUAL BACKGROUND**

The Pancake Complex consists of 1,228,739 acres of public and private land, stretching across the Ely and Battle Mountain BLM Districts and Humboldt-Toiyabe National Forest. PAN_06459–61. The Complex contains the Pancake Herd HMA, Sand Springs West HMA, Jakes Wash Herd Area ("HA"), and Monte Cristo Wild Horse Territory. PAN_06459.

Given that wild horse herds can increase their numbers by 15% to 25% annually, BLM set the Complex's AML at a sustainable number of wild horses that will simultaneously maintain healthy wild horse populations and rangelands over the long-term. PAN_06460. After years of land use planning, Final Multiple Use Decisions, and a Wild Horse Territory Management Plan, BLM set an AML range of 361–638 wild horses for the Complex, with each HMA within the Complex having its own AML range. *Id.* BLM verified the presence of at least 1,263 wild horses in the Complex in 2025. PAN_06409; *see also* PAN_16657. The verified herd population of wild

horses within and outside the Complex is therefore likely, at a minimum, 197% of the upper AML limit BLM determined necessary for accomplishing the agency's mandate to maintain a thriving natural ecological balance and multiple-use concept in the Complex. PAN_06460–61; 16 U.S.C. §§ 1332–33.

After preparing an EA, receiving public comment, preparing an updated EA, and issuing a decision that directed the removal of excess horses in the Complex, BLM conducted an initial gather of wild horses in early 2022. *Leigh*, 726 F. Supp. 3d at 1214–15. Several plaintiffs, including Wild Horse Education and Rewilding America Now, plaintiffs in this suit, challenged that gather in January 2022. *Id.* at 1215. Both Plaintiffs and Defendants filed cross-motions for summary judgment, which the court adjudicated in a 2024 order granting and denying the parties' motions in part. *Id*. at 1231. The court held that Defendants unreasonably delayed preparing an HMAP and compelled BLM to prepare and approve a new Pancake Complex HMAP within one year of its order. *Id.* The court also vacated and remanded BLM's EA, Record of Decision ("DR"), and FONSI "for the agency to reanalyze the foreseeable effects of the Gather Plan alternatives on wildfire risks in the Pancake Complex." *Id*. The court otherwise denied Plaintiffs' motion and granted Defendant's motion for the remaining claims. *Id.*

As ordered, BLM approved an HMAP and gather plan that it had analyzed in an EA and FONSI for the Pancake Complex on March 4, 2025. PAN_06451–55. BLM prepared its EA "to disclose and analyze the environmental effects" of BLM establishing an HMAP and gathering and removing excess wild horses from the Pancake Complex. PAN_06459. The agency determined that excess horses need to be removed from the Pancake Complex to achieve a thriving natural ecological balance based on factors including but not limited to: (1) herd populations exceed the established AML range and are likely increasing each year due to foaling, (2) excess wild horses

have established populations outside identified HMA boundaries, (3) moderate, heavy, and severe utilization of key forage species within the complex, (4) wild horses have contributed to not meeting Rangeland Health Standards throughout most of the Pancake HMA, (5) wild horses have caused water source damage and damage to water development, (6) BLM has needed to conduct multiple emergency water trap gathers due to lack of water in HMAs, (7) the 2022 gather removed 2,030 excess horses but not enough to reach AML for the Pancake Complex, (8) monitoring and historical information indicate that emergency removals will likely be necessary in the future due to lack of water and forage. PAN_06461–62.

BLM therefore set the following objectives for the Complex: (1) implement the HMAP with a management strategy employing several population growth suppression methods, (2) establish an AML range for Sand Springs West HMA of 28–49, (3) immediately gather and remove excess animals to reach low AML, (4) apply fertility control methods to released mares, and (5) maintain a sex ratio adjustment of 60% male and 40% female. PAN_06452–53. Consistent with the court's direction on remand, the EA also analyzes the foreseeable effects of gather plan alternatives on wildfire risks in the Complex.

## LEGAL STANDARD

Wild Horse Act, NEPA, and FLPMA claims are reviewed under the APA. *Cascadia*, 153 F.4th at 892; *Friends of Animals*, 164 F.4th at 746. Under the APA, agency decisions may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency decisions are arbitrary and capricious only if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation . . . that runs counter to the evidence . . . or

is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Friends of Animals*, 164 F.4th at 746 (internal quotation marks and citation omitted).

This standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.,* 499 F.3d 1108, 1115 (9th Cir. 2007) (internal quotation marks and citation omitted). "[A] reviewing court must generally be at its most deferential" when reviewing determinations involving agencies' technical expertise and scientific judgments. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). "The APA does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (per curiam) (citation omitted). Rather, the Court's role is to discern whether "the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *N. Cascades Conservation Council v. U.S. Forest Serv.*, 136 F.4th 816, 824 (9th Cir. 2025) (internal quotation marks and citation omitted).

In the APA context, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985). A reviewing court should determine agency compliance with the law solely on the record before the agency at the time the decision was made. *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 973, 992–93 (9th Cir. 2014).

## ARGUMENT

### I. Plaintiffs' Wild Horse Act claims fail.

As detailed below, the record demonstrates that BLM conducted a thorough, reasoned analysis in developing the Pancake Complex HMAP and accompanying gather authorization that complied with all Wild Horse Act requirements. BLM closely followed agency guidance and made management decisions in accordance with its special expertise in managing wild horse and burro populations. Accordingly, the Court should uphold BLM's HMAP and gather decision and enter summary judgment for Defendants on Plaintiffs' Wild Horse Act claims.

#### A. The Pancake Complex HMAP complies with the Wild Horse Act.

As an initial matter, neither the Wild Horse Act nor its implementing regulations specify what components should be included in an HMAP. Indeed, the Wild Horse Act does not mention HMAPs at all, and Wild Horse Act regulations state only that they agency "shall prepare a herd management area plan, which may cover one or more herd management areas." 43 C.F.R. § 4710.3-1; *see also Leigh*, 726 F. Supp. 3d at 1218 (noting that "[o]nly two regulations discuss HMAPs" and "[n]either lays out what comprises an HMAP, leaving that largely up to the agency to decide"). To that end, Plaintiffs' argument as to what an HMAP is required to include largely relies on the recommended process for developing an HMAP outlined in BLM's Wild Horse Act Management Handbook. *See* Pls.' Br., Dkt. No 36 at 13. However, BLM's "wild horse handbook does not have the independent force and effect of law sufficient to bind BLM to its stated pronouncements for purposes of an APA claim." *Friends of Animals*, 353 F. Supp. 3d at 1005; *see also Forest Guardians*, 309 F.3d at 1143. Instead, "[t]he important question is whether BLM followed the applicable Wild Horse Act regulations.[]"

*Friends of Animals v. U.S. Bureau of Land Mgmt.*, No. 2:16-CV-1670-SI, 2018 WL 1612836, at *18 (D. Or. Apr. 2, 2018).

In any event, the record demonstrates that BLM followed the process outlined in its nonbinding Wild Horse Act Handbook and that Plaintiffs' claims largely misstate or misinterpret the Handbook's language. As detailed below, BLM developed an HMAP in accordance with applicable Wild Horse Act regulations and guidance, considered all relevant factors, and articulated a rational connection between the facts found and the choices made. And while Plaintiffs argue that a gather decision cannot be issued concurrently with an HMAP, Plaintiffs identify no statute or regulation prohibiting concurrent decisions, and *Leigh* rejected their premise that an approved HMAP is a prerequisite to gathering excess horses. *See* 726 F. Supp. 3d at 1217–20. Accordingly, Plaintiffs' claims must fail and the Court should enter summary judgment for Defendants.

**i. The Pancake Complex HMAP outlines reasoned management objectives based on a robust analysis of the Complex's current conditions in accordance with agency guidance.**

First, while Plaintiffs claim that the HMAP lacks specific or recent data on certain aspects of range and habitat health within the Pancake Complex, Pls.' Br. at 14–15, as explained above, the Wild Horse Act and its implementing regulations do not have any specific requirements for the contents of an HMAP. Moreover, the nonbinding Wild Horse Act Handbook does not specify what data BLM must consider when assessing existing herd conditions; rather, the Handbook states that BLM should develop a management evaluation report that "documents the key issues identified as a result of the management evaluation" and that the HMAP itself should "establish short-and long-term management and monitoring objectives for a specific [] herd and its habitat" and "identify the actions to be taken to accomplish herd and habitat management objectives." PAN_01360.

Even still, the management evaluation report contains a robust analysis of existing habitat conditions and management of the Pancake Complex, including current forage utilization, range improvement developments, and livestock grazing. PAN_06695–99. The report also details issues with water availability throughout the Complex. PAN_06696–97. The HMAP then outlines management objectives and actions and a monitoring plan consistent with BLM's goal of achieving and maintaining a thriving natural ecological balance while preserving a multiple-use relationship, consistent with BLM's approved land use plans and the Wild Horse Act. PAN_06675–81. For example, the HMAP lists sustaining healthy populations of wild horses as one of numerous management objectives, and lists corresponding actions meant to achieve that objective, including "maintain[ing] existing water developments to assist in limiting the distance horses travel to and from water sources" and "conduct[ing] emergency removals when needed" if lack of forage, water, or wildfire result in deteriorating animal body conditions. PAN_06680. In addition, the HMAP outlines a thorough plan for monitoring population and habitat management objectives. PAN_06681–83. Moreover, regulations do not impose the specific requirement Plaintiffs assert to include a livestock-removal plan in the HMAP, Pls.' Br. at 15. Rather, 43 C.F.R. § 4710.5(a) authorizes the officer to close areas to livestock grazing if necessary for the purposes specified in the regulation. BLM's methodology in developing an HMAP directly corresponds to the process outlined in BLM's Wild Horse Act Handbook, and Plaintiffs fail to identify any legal obligations or agency guidance that BLM did not follow.

Plaintiffs' arguments regarding the sufficiency of BLM's consideration of alternatives to the HMAP, Pls.' Br. at 18–19, similarly lack merit. While the nonbinding Wild Horse Act Handbook does instruct BLM to develop a "range" of alternatives, the Handbook does not elaborate on how much that range should vary. PAN_01387. Instead, the Handbook explains that

"various management tools may be considered" including "differing gather seasons or methods, various tools to slow population growth, or various habitat improvement tools." *Id.* The HMAP aligns with this guidance, as the alternatives propose using different methods to control population growth such as releasing non-reproducing males or removing horses without implementing fertility control or sex ratio adjustments. PAN_06679. These choices affect reproduction and the expected frequency and extent of later removals, not simply the mechanics of a single gather. Moreover, "[a]gencies need not consider alternatives that do not advance the purpose of a project or are otherwise infeasible or impractical." *See Wild Horse Educ. v. U.S. Dep't of the Interior*, No. 3:23-CV-00568-ART-CSD, 2025 WL 2073994, at *8 (D. Nev. July 22, 2025). BLM assessed all reasonable alternatives it found to advances the purpose of the project, which is all that is required.

In sum, BLM complied with all Wild Horse Act regulations and agency guidance when developing the HMAP for the Pancake Complex. While Plaintiffs may disagree with BLM's management decisions, the record confirms BLM fulfilled all requirements and thus the Court should enter summary judgment in Defendants' favor.

**ii. BLM was not required to reaffirm previously established AMLs for the Pancake Complex when developing an HMAP.**

Plaintiffs next take issue with the HMAP's reliance on established AMLs for the HMAs that make up the Pancake Complex. Pls.' Br. at 16–18. While Plaintiffs concede that the AMLs they refer to were established through prior, separate decision-making processes, *id.* at 17, Plaintiffs imply that BLM was required to revisit those AML decisions when developing the HMAP. *Id.* However, both agency policy and relevant caselaw confirm there is no such requirement. Indeed, neither the Wild Horse Act nor the Wild Horse Act Handbook require BLM to recalculate every previously established AML solely because it adopts an HMAP, and BLM instead properly referenced prior established AMLs in its analysis in accordance with agency

guidance. *See* PAN_01385–93 (Wild Horse Act Handbook's HMAP Analysis and Decision Process, noting that an HMAP need only include description of current AMLs and how they were established). Courts have similarly confirmed that "nothing in the [Wild Horse Act] requires the BLM to determine new AMLs based on current conditions every time the BLM decides to take action to restore the already-established AMLs." *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1064 n.13 (9th Cir. 2014) (upholding use of "decade-old" AMLs that were later validated through a risk management plan ("RMP")); *see also Friends of Animals*, 353 F. Supp. 3d at 1008 ("BLM is given great deference both in establishing AMLs and in reevaluating established AMLs."). And to the extent Plaintiffs are attempting to challenge the validity of the previously established AMLs for the Pancake Complex, those AMLs were established through separate decision documents that are not at issue here and any direct challenge to them must also satisfy the six-year limitations period measured from the particular plaintiff's injury from final agency action. *See* 28 U.S.C. § 2401(a); *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys*., 603 U.S. 799, 814–15 (2024).

**B. BLM's gather plan for the Pancake Complex did not violate the Wild Horse Act.**

Plaintiffs' final argument alleges that BLM's gather plan violates the Wild Horse Act because it authorizes gathers to achieve and maintain the population within AML range "for the life of the plan." Pls.' Br. at 20. Not so. While Plaintiffs claim that BLM's gather plan contains "the same defect a court recently identified in ten-year gather decisions," *id.*, the decision Plaintiffs reference is not binding on this Court, and this Court has in fact recently upheld a gather plan similar to the one here that authorized "maintenance" gathers taking place over multiple years. *See Colvin & Son, LLC v. Haaland*, 763 F. Supp. 3d 1176, 1183 (D. Nev. 2025). Other recent cases in the Ninth Circuit have also upheld use of a single gather plan to authorize multiple gathers over the course of several years. *See Friends of Animals*, 820 F. App'x at 516 (upholding "BLM's use

of a single gather plan and a single environmental assessment to cover a period of years and a series of individual gather operations”). At any rate, the gather plan for the Pancake Complex does not have the ten-year timeline that the D.C. Circuit found objectionable and also does not authorize “maintenance” gathers. Rather the gather plan authorizes BLM to “[i]mmediately gather and remove excess animals to reach low AML as expeditiously as possible through an initial gather, and if necessary, a follow-up gather or gathers.” PAN_06466. Accordingly, the Court should reject Plaintiffs’ arguments and uphold BLM’s gather plan.

## II. BLM complied with FLPMA when the agency developed the HMAP and gather plan.

The decision to implement HMAP management strategies and gather excess horses is consistent with all land use planning requirements governing the Pancake Complex, and therefore did not violate FLPMA. FLPMA requires that BLM manage the Complex in conformance with applicable land use plans. 43 U.S.C. § 1732(a); PAN_06463. Here, four land use plans cover the Pancake Complex: the 2008 Ely District RMP, the Tonopah RMP, the Humboldt National Forest Land and Resource Management Plan, and the Nevada and Northeastern California Greater Sage-grouse RMP Amendment. PAN_06462–63. The HMAP and gather plan at issue here both comply with the unambiguous terms of these land use plans. *Id.*

BLM has decided to implement the HMAP and gather excess horses because these actions will prevent the degradation of public lands associated with excess wild horses. BLM approved the HMAP and gather plan to help ensure that BLM will “prevent undue or unnecessary degradation of the public lands associated with wild horses” and “restore a thriving natural ecological balance and multiple-use relationship on public lands, consistent with FLPMA.” PAN_06462. The land use plans each direct BLM to act with this purpose. PAN_06462–63. In its EA, BLM thoroughly explained why and how, given the agency’s expertise, the decision to

implement the HMAP and gather excess horses complies with this purpose. PAN_06470–76. Immediate horse gathers help the agency achieve "a thriving natural ecological balance on the range as identified within the" Wild Horse Act. PAN_06470. Applying fertility control measures and adjusting herd sex ratios under the HMAP's management strategy does the same. PAN_06471. Each identified action furthers BLM's purpose in compliance with the RMPs governing land use in the Complex.[3] PAN_06470–71.

Plaintiffs argue that BLM violated FLPMA by not revisiting or adjusting AMLs in each of the Complex's HMAs. They assert that the applicable land use plans require BLM to revisit or adjust AMLs. But "nothing in the [Wild Horse Act] requires the BLM to determine new AMLs based on current conditions every time the BLM decides to take action to restore the already-established AMLs." *In Def. of Animals*, 751 F.3d at 1064 n.13. And no such requirement exists in any of the relevant land use plans. Indeed, in the prior case, the court observed that none of the Complex's RMPs "commit BLM to recalculating the AML in any particular timeframe." *Leigh*, 726 F. Supp. 3d at 1228–29. Plaintiffs now cite those same RMPs in their motion and expect a different result. Nothing in the record supports that claim.[4]

In short, BLM did not violate FLPMA. The HMAP and gather plan comply with FLPMA because BLM has ensured that the Proposed Action is consistent with all land use planning

---

[3] The HMAP and gather plan also comply with the Greater Sage-grouse RMP Amendment. The Greater Sage-grouse RMP specifically directs BLM to manage the Complex to achieve and maintain Greater Sage-grouse habitat objectives. PAN_06463. The Proposed Action complies with these objectives by tailoring horse gather activities to ensure that Sage-Grouse habitat is protected, including that no horse traps or holding sites are to be set up on Sage-Grouse leks or during the animals' breeding season. PAN_06477.

[4] For example, Plaintiffs argue that BLM violated the 2008 Ely RMP because it ties AML adjustments to habitat and monitoring data. Plaintiffs mistake the procedure required to amend an AML for an instigating cause that compels BLM to amend AML. The 2008 Ely RMP gives BLM discretion to adjust an AML as long it does so based "on monitoring data." PAN_00942.

requirements that govern the Complex. Plaintiffs' arguments are nothing more than a repackaging of their Wild Horse Act claims about AML. But just as the Wild Horse Act does not compel BLM to reassess and reset AML every time it authorizes a gather, neither does FLPMA, a general land use statute, and the Court should not read that statute to impose a substantive obligation absent from the Wild Horse Act. There is no basis for Plaintiffs' claims.

**III. Plaintiffs' NEPA claims fail.**

In conducting an EA and FONSI, BLM complied with NEPA and therefore did not violate the APA. First, BLM reasonably considered the cumulative impact of implementing HMAP management strategies and a gather in the Complex. Second, BLM considered a reasonable range of alternatives given the Wild Horse Act's directives. Third, BLM established baseline conditions which informed its decision making in the Complex. Fourth, Plaintiffs' tiering argument is misplaced because BLM did not attempt to engage in "tiering" under NEPA. Fifth, Plaintiffs' scope of review argument is misplaced because the decision to implement HMAP management strategies and a gather are consistent with the HMAP and gather plan's scope of review. Sixth, BLM followed the court's direction and considered wildfire risks posed by each alternative action, also explaining the agency's decision to select its Proposed Action based on those risks.

**A. BLM reasonably considered cumulative impacts.**

BLM reasonably considered the cumulative impacts of implementing HMAP management strategies and a gather in the Complex, satisfying the deferential requirement of NEPA. Plaintiffs, relying on the Council on Environmental Quality ("CEQ") regulation repealed just after BLM's decision, argue that BLM merely listed past, present, and reasonably foreseeable actions, but did not analyze the cumulative impact of any of those actions with the proposed action. Pls.' Br. at 24. Plaintiffs are incorrect.

The agency identified several past, present, and future actions for purposes of its cumulative impacts analysis, as Plaintiffs note. *See* PAN_06523. BLM then dedicated subsequent pages of the EA, the entirety of Section 4.0, to discussing cumulative effects of these actions with its proposed action. PAN_06523–27. For example, gathering excess wild horses will help ensure that HMAs "have suitable habitat for an AML range that maintains adequate levels of genetic diversity, age structure, and targeted sex ratios in herds." PAN_06526. As BLM and the Forest Service also achieve national AML goals, fertility control measures will become more readily available and gathers should become more predictable due to available facility space. *Id*. The combined effect of more facility space and available fertility control measures should be "an increase in stability of gather schedules and longer periods of time between gathers." *Id.*

After that discussion, and based on the analysis, BLM concluded that "the combination of the past, present, and reasonably foreseeable future actions, along with the Proposed Action or action alternatives, should result in more stable and healthier wild horse populations, healthier rangelands, . . . and fewer multiple-use conflicts within" the Complex. PAN_06527. BLM also concluded that all present and reasonably foreseeable future actions will "minimize the spread of weeds throughout the watershed" and reduce the risk of wildfire "due to increased resilience of the landscape due to disturbance." *Id.* Plaintiffs are wrong that BLM merely listed actions and moved on. The agency identified and discussed potential cumulative impacts, and that is all that NEPA, a deferential and procedural statute, required.

**B. BLM considered a reasonable range of alternatives.**

BLM's HMAP and gather plan included a thorough discussion of reasonable alternatives and is therefore reasonable under NEPA. NEPA requires that BLM consider "a reasonable range of alternatives" when developing an EA. *Leigh*, 726 F. Supp. 3d at 1226; *Friends of Animals*, 164 F.4th at 756. This requirement "is a lesser one than under an EIS and need only include a brief

discussion of reasonable alternatives." *Friends of Animals*, 164 F.4th at 755 (citation modified). "The stated goal of a project necessarily dictates the range of 'reasonable' alternatives . . . ." *City of Carmel–By–The–Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). Thus, whether the range of alternatives considered was reasonable turns on the scope of the agency's purpose and need. *Friends of Animals*, 164 F.4th at 755.

The EA's purpose and need statement reads:

> The BLM's purpose is to adopt and implement a Herd Management Area Plan (HMAP) consistent with the authority provided in 43 CFR Part 4700, restore and maintain Thriving Natural Ecological Balance (TNEB) by maintaining wild horse populations within the established AML ranges for the HMAs, and to reduce wild horse population growth rates to extend the time between gather events.
> The BLM's need is to prevent undue or unnecessary degradation of the public lands associated with excess wild horses, and to restore a thriving natural ecological balance and multiple-use relationship on public lands, consistent with FLPMA and the WFRHBA, as well as conform with 43 CFR 4710.3-1 and BLM policies including the BLM Handbook H-4700.

"BLM has considerable discretion in tailoring the purpose and need" of an EA and "must consider the views of Congress as expressed in the agency's statutory authorization to act." *Friends of Animals*, 164 F.4th at 756 (internal quotation marks and citation omitted). The Court has previously explained that the Wild Horse Act prescribes a strict statutory mandate that governs BLM's purpose and need statement.[5] *Wild Horse Educ.,* 2025 WL 2073994, at *9. The Wild Horse Act requires BLM to manage wild horses "in a manner that is designed to achieve and

[5] Plaintiffs argue that the purpose and need statement is unreasonable under NEPA because the need to protect against rangeland degradation by wild horses is unsubstantiated in the record. The Wild Horse Act, however, requires BLM "[to] protect the range from the deterioration associated with overpopulation" of wild horses and burros. 16 U.S.C. § 1333(b)(2). BLM's purpose and need statement cannot be unreasonable under NEPA simply because Plaintiffs disagree with the Wild Horse Act's directives.

maintain a thriving natural ecological balance" and directs the agency to "protect the range from the deterioration associated with overpopulation" of wild horses. 16 U.S.C. §§ 1333(a), (b)(2).

BLM's purpose and need here, tracking the requirements imposed by Congress in the Wild Horse Act and FLPMA, was reasonable. In turn, it governs whether BLM considered a reasonable range of alternatives. It did. The HMAP and gather plan considered five alternative courses of action, including a no action alternative: (1) a no action alternative, under which BLM would continue its existing management and a gather would not occur, (2) Alternative A, under which BLM would implement the HMAP with a management strategy including population growth suppression methods, establish an AML range of 28–49 for Sand Springs West HMA, and immediately gather excess animals to reach low AML, (3) Alternative B, under which BLM would take the same actions as Alternative A but would also release a non-reproducing component of male horses to bring the population to mid-AML, (4) Alternative C, under which BLM would implement the HMAP with a management strategy and gather excess animals without fertility control, sex ratio adjustments, or releasing a component of males, (5) Alternative D, under which BLM would capture 100% of excess horses within and outside the Jakes Wash HA. PAN_06466. BLM discussed the details of these alternatives and how they might support the agency's objectives across twenty-three pages of the EA. PAN_06466–85. This more than satisfies the reasonability requirement for considering alternatives in an EA.

None of the alternatives Plaintiffs now point to fit with the agency's purpose and need. Plaintiffs claim BLM needed to consider alternatives addressed to livestock. Pls.' Br. at 28. But amending a resource management plan to address livestock usage would not serve the purpose or need of satisfying BLM's Wild Horse Act obligations, as set by Congress. Plaintiffs' argument is one about outcome and policy: Plaintiffs would prefer the public lands be managed differently,

with BLM taking certain actions as to livestock and not taking certain actions toward wild horses. Indeed, they give away the game when they assert that "BLM's consideration should have been more substantive." *Id.* NEPA is not, however, a substantive statute. Plaintiffs cannot attempt to use its procedural requirements to achieve a different policy choice. Because BLM thoroughly considered a reasonable range of alternatives given its purpose and need, it satisfied this NEPA obligation.

**C. BLM established baseline conditions in the Pancake Complex.**

BLM monitoring activities established baseline conditions that informed the agency's decision to implement the identified HMAP management strategies and wild horse gather. These activities ensured that BLM's decision making was "based on accurate information and defensible reasoning." *Great Basin Res. Watch v. U.S. Bureau of Land Mgmt.*, 844 F.3d 1095, 1103 (9th Cir. 2016) (citing *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016)).

A population census flight in March 2023 confirmed estimates that at least 1,104 excess wild horses above the low end of AML existed in the Complex. PAN_06461. Similar population inventory flights are conducted every two to three years to confirm herd size in the Complex. PAN_06492. Before establishing the HMAP and gather plan, BLM also collected utilization data for key forage species in the Pancake HMA, Jakes Wash HMA, Sand Springs West HMA, and Monte Cristo WHT. PAN_06488–91, PAN_06693–94. In the decade leading up to the HMAP and gather plan, wild horse use of key forage species increasingly moved towards heavy and severe use, with 7% of original monitoring sites having been lost with not enough forage species to perform a utilization analysis. PAN_06696. BLM also conducted genetic diversity sampling during the 2022 gather and determined that baseline variability levels are near average in the Complex. PAN_06492. Using this data, BLM decided to implement HMAP management

strategies and a wild horse gather based on a reasonable understanding of baseline conditions in the Complex. Plaintiffs' arguments to the contrary fail.

**D. Plaintiffs' tiering argument is misplaced.**

Because BLM did not attempt to engage in "tiering" under NEPA—it did not attempt to satisfy its NEPA obligations by relying on past analyses—Plaintiffs' argument fails. Plaintiffs argue that relying on previously-set AMLs is somehow an attempt at tiering, and that because the prior AML decisions did not, according to Plaintiffs, undergo sufficient NEPA analysis, BLM cannot now rely on those decisions to meet its NEPA obligations. Pls.' Br. at 25–26. This argument lacks merit.

BLM did not seek to satisfy any current NEPA obligations by identifying the governing AMLs for the HMAs at issue. Rather, BLM identified those governing AMLs in its environmental analysis for the current proposed actions. That BLM had previously set AMLs is in no way an attempt to substitute for current environmental analysis. Those levels simply inform the assessment of thriving, natural ecological balance under the Wild Horse Act.

Plaintiffs' argument boils down to an assertion that any reference to past decisions or documents requires every single one of those documents or references to have undergone NEPA, even if they are not part of the currently proposed action. And the upshot of Plaintiffs' view is that BLM would need to undertake NEPA analysis of AML every single time it proposed a gather, even if it was not changing AML. Which means, in short, this is another attempt by Plaintiffs to avoid the holding that "nothing in the [Wild Horse Act] requires the BLM to determine new AMLs based on current conditions every time the BLM decides to take action to restore the already-established AMLs." *In Def. of Animals*, 751 F.3d at 1064. BLM did not attempt to tier in its references to AMLs. The Court should reject Plaintiffs' argument.

**E. Plaintiffs' scope of review argument is misplaced.**

BLM's decision to implement HMAP management strategies and gather excess wild horses are consistent with the HMAP and gather plan's scope of review under NEPA, even if the number of horses BLM must gather goes up. Plaintiffs' arguments to the contrary have no merit.

Plaintiffs argue that if BLM removes more than the 1,104 excess horses identified during the 2023 population census flight, the agency must make a new overpopulation and necessity determination. Pls.' Br. at 29. This argument fails. Under the HMAP and gather plan, BLM determined that "all excess wild horses need to be removed in order to achieve the established AML," not that exactly 1,104 horses need to be removed. PAN_06461. BLM did not conduct its NEPA analysis to inform the removal of exactly 1,104 horses. The DR authorizes BLM to "immediately gather and remove excess animals in order to reach low AML." PAN_06452. The scope of the HMAP and gather plan is such that even if herd populations increase in the intervening time period between gathers, BLM is still authorized to gather down to AML even if the number of horses gathered must go up.

Plaintiffs rely on *Friends of Animals v. U.S. Bureau of Land Mgmt.*, 728 F. Supp. 3d 45, 79–81 (D.D.C. 2024) to argue that the Pancake Complex gather plan will require new overpopulation and necessity determinations. Pls.' Br. at 29. However, in that case the ten-year plan authorized gathers *after* AML was achieved; that is not the case here. *See Friends of Animals*, 728 F. Supp. 3d at 77–78. According to the court:

> In sum, then, the Court construes the WHA to permit the Bureau to adopt gather plans that contemplate conducting a staged gather over a period of time but, at the same time, to require that the Bureau conduct the required gathers as promptly as reasonably possible after making a necessary-to-remove-excess-animals determination pursuant to section 1333(b)(2); that after those gathers achieve AML, the Bureau return to the processes required by section 1333(b)(2) before authorizing future gathers; that it base each new necessary-to-remove-excess-animals determination on current

> information and meaningful consultation with federal, state and independent experts; and that it not ignore material, new information that comes to its attention over time.

*Id*. at 78. That is exactly what BLM has done in the Pancake Complex. *See supra* Section I.B.

**F. BLM complied with the Court's 2024 Remand Order to consider wildfire risks in the EA.**

BLM considered wildfire risks posed by each alternative action in the HMAP and gather plan. In the prior decision, the court vacated and remanded the Pancake Complex's EA, DR, and FONSI "for the agency to reanalyze the foreseeable effects of the Gather Plan alternatives on wildfire risks" and "reach a conclusion as to their significance." *Leigh*, 726 F. Supp. 3d at 1231. The only issue with the previous EA was "the processes by which BLM reached its final result [on wildfire risk], not the final result itself." *Id.* at 1226.

Consistent with the court's directive, BLM considered wildfire risk for each alternative. For its Proposed Action, Alternative A, BLM considered that reducing the number of wild horses in the Complex to maintain AML would result in a short-term increase in fine fuels. PAN_06520. This short-term increase could result in a theoretical increase in wildfires. *Id*. But the removal of excess wild horses might reduce the long-term increase in areas dominated by annual invasive grasses. *Id*. Reducing the area dominated by invasive grasses would theoretically reduce the amount and frequency of future wildfires. *Id*. BLM thus considered that the cumulative impact of its Proposed Action would be a short-term increase in fine fuels, ultimately leading to an increase in native understory species. PAN_06521. An increase in native species increases range resiliency and will reduce wildfire risk. PAN_06527. This reflects a reasonable consideration of wildfire risk.

BLM considered wildfire risk for its alternatives, too, including the no-action alternative. Alternatives B, C, and D all would have similar wildfire impacts to the Proposed Action because

managing herd populations within AML would promote appropriate grazing across the Complex, increasing the prevalence of native species and therefore reducing long-term wildfire risk. PAN_06520–21. BLM also observed that taking no action would increase wildfire risk by increasing the presence of non-native invasive species susceptible to causing more frequent and intense wildfires. PAN_06521.

In weighing the risks posed by each alternative action and explaining its decision to select the Proposed Action, BLM adequately considered wildfire risks. PAN_06520–21. The decision is rooted in scientific literature and the expert opinions of BLM scientists and staff. PAN_06520. Though Plaintiffs may disagree with BLM's decision, the agency is "entitled to rely on the opinions of its own experts." *Friends of Animals*, 164 F.4th at 749 (internal quotation and citation omitted).

**REMEDY**

Plaintiffs entirely fail to address the *Winter* factors, even though in their conclusion they ask the Court to enjoin Defendants from implementing the gather plan. Pls.' Br. 30. Injunctive relief requires Plaintiffs to prove their entitlement based on each factor under *Winter v. NRDC, Inc.*, 555 U.S. 7, 21 (2008). *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010). Their failure to so much as cite the *Winter* factors is a waiver of any argument for injunctive relief. Even if the Court were to find that BLM acted arbitrarily and capriciously, which it has not, BLM should not be enjoined from conducting the gather. If, alternatively, the Court finds BLM to have acted arbitrarily and capriciously and is not inclined to reject any injunctive relief based on Plaintiffs' waiver, then the Court should provide opportunity for remedy briefing. This Court cannot enjoin BLM based on an inadequate motion from Plaintiffs.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in Defendants' favor on all counts and deny Plaintiffs' motion for summary judgment.

Dated: November 3, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
United States Department of Justice
Energy & Natural Resources Division

/s/ Bonnie Ballard
BONNIE BALLARD, Trial Attorney
(MD Bar No. 2211280027)
Wildlife & Marine Resources Section
Phone: (202) 523-5567
Email: bonnie.m.ballard@usdoj.gov

BRIAN R. HERMAN, Assistant Section Chief
Natural Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Phone: (202) 532-3278
Email: Brian.Herman@usdoj.gov

*Attorneys for Defendants*