BRENT M. RESH
(Nevada Bar No. 14940)
BRENT RESH LAW, PLLC
2401 La Solana Way
Las Vegas, NV 89102
(702) 781-6903
brent@brentreshlaw.com

JESSICA L. BLOME
(California Bar No. 314898, pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

LAURA LEIGH, individually, and WILD HORSE EDUCATION, a non-profit corporation,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT, TRACY STONE-MANNING, Director of the Bureau of Land Management, and JON RABY, Nevada State Director of the Bureau of Land Management,

Federal Defendants.

Case No.: 3:25-cv-00577-ART-CSD

**PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' CROSS MOTION AND REPLY TO RESPONSE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. ARGUMENT .......... 2

A. Summary judgment should be granted as to Plaintiffs' First Cause of Action because BLM failed to comply with the Wild Horse Act. .......... 2

1. BLM violated the WHA because the HMAP is a gather plan in name only. .......... 2

2. BLM never grounded or disclosed the AMLs on which its excess determination rests. .......... 4

3. BLM authorized open-ended removals on a projected excess figure. .......... 8

B. Summary judgment should be granted as to Plaintiffs Second Cause of Action (FLPMA) .......... 9

1. Plaintiffs' FLPMA claim is not foreclosed by *Leigh I.* .......... 10

2. The HMAP/EA-FONSI does not conform to the Tonopah RMP's three-year removal rule. .......... 10

3. The HMAP/EA-FONSI fails to apply the Ely RMP's monitoring-based adjustment. .......... 11

C. Summary judgment should be granted as to Plaintiffs' Third Cause of Action (NEPA). .......... 12

1. BLM did not complete the wildfire analysis this Court required. .......... 12

2. BLM may not rely on AMLs it never analyzed. .......... 13

3. BLM failed to establish baseline conditions. .......... 15

4. BLM's purpose was to adopt an HMAP, but its alternatives only addressed a gather. .......... 16

5. BLM failed to analyze cumulative impacts on the Complex. .......... 17

6. The HMAP/EA-FONSI authorizes removals beyond the scope of BLM's NEPA analysis. .......... 18

D. Vacatur is the appropriate remedy. .......... 18

III. CONCLUSION .......... 19

# TABLE OF AUTHORITIES

## CASES


350 *Montana v. Halland,* 50 F.4th 1254 (9th Cir. 2022) .......... 19

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison,* 67 F.3d 723 (9th Cir. 1995)) .......... 16

*Dahl v. Clark,* 600 F. Supp. 585 (D. Nev. 1984) .......... 4, 6

*Friends of Animals v. BLM,* 728 F. Supp. 3d 45 (D.D.C. 2024) .......... 9, 19

*Friends of Animals v. BLM,* No. 3:15-CV-0057-LRH-WGC, 2015 U.S. Dist. LEXIS 17575 (D. Nev. Feb. 11, 2015) .......... 10, 19

*Friends of Animals v. Burgum,* 164 F.4th 738 (9th Cir. 2026) .......... 15, 16, 17, 18

*Friends of Animals v. Silvey,* 353 F. Supp. 3d 991 (D. Nev. 2018) .......... 3

*Friends of Animals v. Sparks,* 200 F. Supp. 3d 1114 (D. Mont. 2016) .......... 5

*Great Basin Res. Watch v. Bureau of Land Management,* 844 F.3d 1095 (9th Cir. 2016) .......... 16

*In Defense of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior,* 751 F.3d 1054 (9th Cir. 2014) .......... 6

*Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988 (9th Cir. 2018) .......... 15

*Leigh v. Raby,* 726 F. Supp. 3d 1207 (D. Nev. 2024) .......... passim

*Mont. Wildlife Fed'n v. Haaland,* 127 F.4th 1 (9th Cir. 2025) .......... 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29 (1983) .......... 5

*Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233 (9th Cir. 2005) .......... 17

*Pollinator Stewardship Council v. EPA*, 806 F.3d 520 (9th Cir. 2015) .......... 19

*Rybachek v. U.S. Env'tl. Prot. Agency*, 904 F.2d 1276 (9th Cir. 1990) .......... 15

*Skidmore v. Swift & Co.* 323 U.S. 134 (1944) .......... 15

*Te-Moak Tribe of W. Shoshone v. U.S. Dep't of the Interior*, 608 F.3d 592 (9th Cir. 2010) .......... 18

*Wild Horse Educ. v. U.S. DOI,* No. 3:23-cv-00568-ART-CSD, 2025 U.S. Dist. LEXIS 140709 (D. Nev. July 22, 2025) .......... 17, 18

*Winter v. NRDC Inc.,* 555 U.S. 7 (2008) .......... 19


## STATUTES


16 U.S.C § 1332(b)(2) .......... 4

16 U.S.C. § 1333(b) .......... 1

43 U.S.C. § 1732(a) .......... 11

5 U.S.C § 706(2)(A) .......... 2

5 U.S.C § 706(2)(C) .......... 2, 11

5 U.S.C.§ 706 .......... 13, 21

**RULES**

Fed. R. Evid 201(b)(2) ..... 14

**REGULATIONS**

43 C.F.R. § 1610.5-3(a) ..... 11
43 C.F.R. § 1610.5-5 ..... 19
43 C.F.R. § 46.135 ..... 16
43 C.F.R. § 4710.3-1 ..... 3
43 C.F.R. § 4710.4. ..... 3
43 C.F.R. § 4710.5(a) ..... 19

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| AML | Appropriate Management Level |
| APA | Administrative Procedures Act |
| BLM | Bureau of Land Management |
| FEA | Final Environmental Assessment |
| FLPMA | Federal Land Policy and Management Act |
| HMA | Herd Management Area |
| HMAP | Herd Management Area Plan |
| FONSI | Finding of No Significant Impact |
| LUP | Land Use Plan |
| NEPA | National Environmental Policy Act |
| RMP | Resource Management Plan |
| TNEB | Thriving Natural Ecological Balance |
| Wild Horse Act | Wild and Free-Roaming Horses and Burros Act |

## I. Introduction

This District ordered BLM to prepare a herd management area plan (HMAP) and reanalyze the wildfire effects of removing horses. *Leigh v. Raby,* 726 F. Supp. 3d 1207, 1221, 12231 (D. Nev. 2024). BLM's answer is now before the Court. This single document, a gather plan with an HMAP attached, was made effective immediately through a decision record.

As addressed in Plaintiffs' opening brief, (1) BLM violated the Wild Free-Roaming Horses and Burros Act (Wild Horse Act or WHA) and acted arbitrarily and capriciously in violation of the Administrative Procedure Act (APA) when it adopted a gather plan in the form of a Herd Management Area Plan (HMAP) for the Pancake Complex, relying on appropriate management levels whose analytical basis it never disclosed and authorizing removals with no end date; (2) BLM violated the Federal Land Policy and Management Act (FLPMA) and exceeded the scope of its authority in violation of the APA by failing to apply the removal and monitoring requirements of its own land use plans (LUPs); and (3) BLM violated the National Environmental Policy Act (NEPA) and the APA by failing to take a hard look at wildfire risk, baseline conditions, reasonable alternatives, and cumulative impacts. Defendants' opposition and cross-motion fail to demonstrate otherwise. Instead, Defendants respond to arguments Plaintiffs do not make and ask the Court to defer to analysis the record does not contain.

BLM acknowledges that an HMAP must describe current appropriate management levels (AML) for wild horses and include information about how they were established. Yet, the relevant planning documents, including the HMAP/ Final Environmental Assessment (EA)/Finding of No Significant Impact (FONSI) for the Pancake Complex of Herd Management Areas (together the HMAP/EA-FONSI) lack identifying analysis behind appropriate management levels. This is a critical factor the agency is mandated to consider when determining whether or not to permanently gather and remove horses from a herd management area (HMA). 16 U.S.C. § 1333(b). Defendants characterize Plaintiffs' claims as a disagreement with BLM's management decisions. Plaintiffs do not ask the Court to set AML, reduce livestock, or stop BLM from managing these herds. Plaintiffs request that BLM provide data and complete an actual, transparent analysis. BLM's Handbook calls

for disclosure of when and how the existing AML was established. Merely listing the AML and the date or decision that adopted it does not explain how that number was derived. The HMAP's supporting analysis should explain the actual method and evidentiary basis for the AML, rather than simply carry the number forward.

BLM has been removing horses for 25 years and has never shown that a single removal achieves a Thriving Natural Ecological Balance (TNEB), nor has it analyzed why it has failed. Simply, BLM asserts removals to AML are necessary to achieve TNEB, yet, BLM never shows how AML was set and analyzed to achieve AML, nor has BLM ever shown that a removal moves toward or attaints TNEB. BLM contends it is entitled to deference, as agency staff are alleged experts. But the HMAP contains no indication that agency staff applied any expertise, as it is devoid of any calculations or data that support the continued removal of horses from Pancake Complex.

## II. Argument

### A. Summary judgment should be granted as to Plaintiffs' First Cause of Action because BLM failed to comply with the Wild Horse Act.

Plaintiffs' First Cause of Action is based on 5 U.S. Code Section 706(2)(A) and (C) of the Administrative Procedures Act (APA). Dkt. 1, p. 24. A Court must set aside agency action that is arbitrary and capricious, or that exceeds statutory authority. 5 U.S.C. § 706(2)(A), (C). Here, the Court must set aside BLM's actions that fail to comply with the Wild Horse Act because (1) the HMAP is a gather plan in name only, (2) BLM failed to disclose the analysis that determined AML, and (3) BLM authorized open-ended removals on a projected excess figure.

#### 1. BLM violated the WHA because the HMAP is a gather plan in name only.

In *Leigh v. Raby*, this Court compelled BLM to prepare an HMAP for the Pancake Complex and explained why the document matters.[1] 726 F. Supp. 3d at 1231 (D. Nev. 2024) ("*Leigh I*") Defendants quote the Court's observation that the regulations leave an HMAP's content "largely up the agency to decide." Dkt. 38 at 3, 9. They omit the next sentence, "The regulations, however, are clear on what HMAPs are not." *Leigh I,* 726 F. Supp. at 1218. An HMAP is not interchangeable

---

[1] Defendants cite *Leigh I* as "appeal dismissed." Dkt. 38 at 3. BLM appealed Judge Du's decision, and BLM voluntarily dismissed it. *See* No. 24-3534 (9th Cir. Dec. 23, 2024).

with a land use plan, or with a gather plan. *Id.* at 1218-19, and fn. 7. As with land use plans, the differences "go beyond their substance," as an HMAP carries its own "administrative review processes" and its own "middle level of environmental review" in a "tiered, iterative process" that BLM "must uphold…even if it appears formalistic" *Id.* at 1219.

The regulations plainly require that BLM prepare an HMAP, which ensures that BLM meets its statutory management mandate to manage wild horses "at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans." *Id.* 43 C.F.R. §§ 4710.3-1, 4710.4. The HMAP's objectives thus help measure how much management is necessary. An HMAP that contains only gather objectives cannot serve that function.

Discretion over how to prepare an HMAP is not discretion to diminish what an HMAP does.

Plaintiffs do not challenge BLM's choice of planning methods. They challenge BLM's failure to perform the planning function at all.

Defendants respond that BLM's Handbook "does not have the independent force and effect of law." Dkt. 38 at 9 (quoting *Friends of Animals v. Silvey,* 353 F. Supp. 3d 991, 1005 (D. Nev. 2018). Plaintiffs do not litigate to enforce the Handbook. Instead, they rely on the handbook to prove two points. First, BLM tied this decision to remove horses to the Handbook: the purpose and need commits the HMAP/EA-FONSI to conform with "BLM policies including the BLM Handbook H-4700." PAN_06462. Having adopted that standard, BLM cannot disclaim it now.

Second, the Handbook is BLM's own explanation of what its regulations require, including what an HMAP is and how AML is set. PAN_01385-93, 01395. As noted above, *Leigh I* relied on the same Handbook to draw the distinctions among HMAPs, land use plans, and gather plans. 726 F. Supp. 3d at 1218-19 & fn. 7 Defendants themselves rely on it. Dkt. 38 at 10, 13. Again, BLM cannot invoke the Handbook where it helps and disclaim it where it does not. To do so is arbitrary and capricious.

Finally, BLM's response to the *Leigh I* Order collapsed the very distinctions between planning documents the Court drew. BLM approved the Pancake HMAP/EA-FONSI, a new Sand Springs West AML, and a gather in a single decision, and made all of it "effective immediately pursuant to 43 CFR 4770.3(c)," the provision for gather decisions.  PAN_06452 (Decision Record).

By routing the HMAP/EA-FONSI and AML through the removal track, BLM did exactly what *Leigh I* warned against: it "[e]ngag[ed] in the decision-making of an HMAP" while depriving the public of "the administrative review process to which they are entitled." *Leigh I,* 726 F. Supp. at 1219; Dkt. 36 at 19 (gather/removal decisions have a faster effective date because they are a different decision than HMAP and AML decision, citing PAN_01394-96). Plaintiffs do not contend that BLM may never gather before or alongside an HMAP. *Cf.* Dkt. 38 at 10. BLM may not merge an improper HMAP into a gather.

**2. BLM never grounded or disclosed the AMLs on which its excess determination rests.**

AML is established through site-specific data that addresses the optimal population levels necessary to achieve and maintain a thriving natural ecological balance (TNEB) within a given HMA. 16 U.S.C. § 1332(b)(2); *Dahl v. Clark,* 600 F. Supp. 585, 592-95 (D. Nev. 1984). Where AML is not set by such data and consideration, BLM may not rely upon AML in its removal decisions. *See Dahl,* 600 F. Supp. at 592-93 (BLM may not establish AML without evidence, analysis or studies). And BLM's Handbook sets the upper limit of AML as "the maximum number of [wild horses and burros] which results in a TNEB and avoids a deterioration of the range." PAN_01366.

**a) The record does not trace any of the Complex's AMLs to site-specific analysis.**

Defendants state an HMAP "need only include [a] description of current AMLs and how they were established." Dkt. 38 at 13 (Citing PAN_01385-93). The Handbook pages cited call for "[t]he name and date of any decision document(s) used to establish or adjust AML along with a brief description of the causal factors leading to the change." PAN_01389. The HMAP does not meet even that low standard.

**Pancake HMA** (240-493). The 2008 Ely RMP created the Pancake HMA by combining the Sand Springs East and Monte Cristo HMAs designated in the 1987 Egan RMP. PAN_06459, 06488. The HMAP/EA-FONSI does not state how those units' AMLs became 240-493. It says only that the range "was established through prior decision-making processes then affirmed through the 2008 Ely RMP," without naming any of those processes. PAN_06460. BLM has confirmed that the analysis

underlying the Ely RMP was not before the agency when it prepared the HMAP. Dkt. 36-5 (Blome Decl. ¶ 4, Exh. B.)

**Sand Springs West HMA** (49; now 28-49). This AML originated in a May 11, 1992, consent decision resolving a dispute between BLM and three livestock operators before the Office of Hearings and Appeals. PAN_06490. The parties stipulated that 49 horses was the maximum that would permit balance "of the uses and resources upon the following allotment(s)." *Id.* The 1997 Tonopah RMP adopted that number, and the HMAP now converts it into a range for the first time. PAN_06461, 06466-67.

**Monte Cristo WHT** (72-96). The Forest Service's territory plan set a baseline of 72-120 and the 1986 Humboldt LRMP lowered the limit to 96 because "range conditions had not improved." PAN_06491. Nothing in the record reflects any evaluation in the four decades since, though the HMAP/EA-FONSI reports that conditions still "have not improved." *Id.*

The Decision Record states only that "[t]he AMLs were set under" the Ely and Tonopah RMPs, and that monitoring "do[es] not indicate that increasing, evaluating, or revising the AML is warranted." PAN_06451, 6453. But BLM does not identify any monitoring. BLM has removed at least 6,749 horses from the Complex in reliance on these figures. PAN_06525. Reaffirming an AML no one can trace is not reasoned decision-making. *See Friends of Animals v. Sparks,* 200 F. Supp. 3d 1114, 1122-23 (D. Mont. 2016) (explaining differences between reaffirming and recalculating AML, finding BLM committed to recalculating AML); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983).

**b) Plaintiffs do not seek recalculation of AML.**

Defendants respond to an argument Plaintiffs do not make. Plaintiffs do not contend that BLM must recalculate AML before every gather. *See* Dkt. 36 at 17. Plaintiffs contend that an HMAP structured around AML must disclose the analytical basis for it. PAN_01389. Defendants concede this as well. Dkt. 38 at 13 (an HMAP must include "how [AMLs[ were established.") This record fails to do so. PAN_06460; Dkt. 36-5, Blome Decl. Exh. B.

BLM's own Handbook requires that every AML decision must be "set based on in-depth analysis of site-specific resource monitoring data," not "administrative convenience or single

surveys." PAN_01395 (citing generally, *Dahl v. Clark,* 600 F. Supp. 585 (D. Nev. 1984); *see Dahl,* 600 F. Supp. at 592-595. *In Defense of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior,* upheld reliance on AMLs that, by Defendants' own description, had been "validated through a[n] RMP." 751 F.3d 1054, 1064 n. 13 (9th Cir. 2014); Dkt. 38 at 13. Here, as BLM admits, the RMP analysis is not in the record. Dkt. 36-5, Blome Decl. Exh. B.

Defendants state that Plaintiffs "concede" the AMLs were set through prior decision-making processes. Dkt. 38 at 12. In fact, Plaintiffs wrote that this is what BLM "contends," and that BLM "never performed, or at least never disclosed, the site-specific, multi-year monitoring analysis its own Handbook demands." Dkt. 36 at 17. Defendants then insist BLM need not recalculate ALM "every time" it acts. Dkt. 38 at 13 (quoting *In Def. of Animals,* 751 F. 3d at 1064, fn. 13). Plaintiffs agree, and do not argue these AMLs were once valid and have grown stale.

Plaintiffs contend the AMLs were never grounded in the site-specific analysis the Act requires, and that BLM cannot identify, nor disclose, any such analysis now. *In Defense of Animals* upheld reliance on AMLs that, by Defendants own description, had been "validated through a[n] RMP." Dkt. 38 at 13. Here, BLM admits that the RMP analysis is not in the record. Dkt. 36-5, Blome Decl. Exh. B. These AMLs were never validated, they were only retyped.

The deference BLM claims "in establishing AMLs" presupposes analysis it can identify. Dkt. 38 at 13. Plaintiffs asked for this analysis, "Where is the AML evaluation based on monitoring data…? Where are the 'proper use' studies used to establish a baseline AML. . .?" PAN_06753 (Comment 41); *see also* Dkt. 36 at 9 (scoping request for underlying data). BLM never answered. PAN_06753-54. Plaintiffs challenge BLM's 2025 decision to rely on earlier AMLs, and the representation that the AMLs rest on "monitoring data" and "in-depth analysis" as the premise for removing horses now. PAN_06460. That decision is timely, and BLM must support it on this record.

**c) BLM established the Sand Springs West AML without analysis, building on a number negotiated with livestock operators.**

Plaintiffs showed that the Sand Springs West AML is not the product of any site-specific analysis but was set in the decision under review. Dkt. 36 at 17-18; *see also id.* at 11; PAN_06452.

It is a 1992 stipulation among BLM and three livestock operators, resolving a dispute before the Office of Hearings and Appeals, in which the parties agreed that 49 horses was the maximum that would permit balance “of the uses and resources upon the following allotment(s).” PAN_06490; Dkt. 36 at 17. That agreement “reflects the competing economic interests of the parties to that proceeding,” not a “site-specific environmental analysis” grounded in forage, water, or habitat data. Dkt. 36 at 17-18. Defendants do not respond. Their brief never mentions the consent decision.

Rather than establish that number, the decision under review builds on it. The Decision Record orders BLM to “[e]stablish an AML range for Sand Springs West HMA of 28-49 wild horses.” PAN_06452. BLM’s Handbook requires “[a]n analysis under NEPA…to establish a population range (upper and lower limit) for AMLs initially established as a single number” and, “[a]n interdisciplinary and site-specific environmental analysis,” which includes “an in-depth evaluation of intensive monitoring data” to establish or adjust any AML. PAN_01359, 01367.

BLM’s only explanation for the new range is arithmetic: 28 horses growing “at an average rate of 20% per year” would reach 49 in three years. PAN_06467, 06470. That calculation rests on a growth assumption that BLM’s own data contradict. *See infra* Part A.3(a). BLM also concedes this number includes an upper limit it did not examine: “[t]hese alternatives are not re-evaluating the max number of wild horses that can be managed on their range.” PAN_06753. And BLM approved the new range in the same decision as the gather, effective immediately, even though its Handbook directs that an AML decision “should be separated from the gather/removal decision.” PAN_06452, 01396.

BLM has not shown how the settlement weighted the horses’ forage, water, or habitat needs. At twelve AUMs per horse per year, 49 horses receive about 7% of the forage on an allotment carrying 7,843 livestock AUMs. PAN_01417, 06510. Horses may drink at livestock water hauls only “while domestic livestock are grazing.” PAN_ 06490.

The new lower limit of 28 falls far below the 150-200 animals BLM’s Handbook identifies as necessary to maintain genetic diversity. PAN_01371. This is a consequence the HMAP/EA-FONSI does not address for this herd. BLM’s genetics finding pools the entire Complex. PAN_06492; *see also* Dkt. 38 at 20 (citing the sampling during the 2022 gather for the entire

Complex). The HMAP/EA-FONSI fails to address what managing Sand Springs West to as few as 28 horses means for that herd.

**3. BLM authorized open-ended removals on a projected excess figure.**

**a) BLM's excess determination rests on a growth assumption its own data contradict.**

Defendants' defense rests on growth. They state that herds "increase their umbers by 15% to 25% annually" and are "likely increasing each year." Dkt. 38 at 5-6. This means that "all excess" horses may be removed "even if the number…must go up." *Id.* at 22; *see* Dkt. 36 at 20 (removals "based on projected future population growth." But BLM did not count 1,104 excess horses, *it projected them.* (emphasis added). The March 2023 survey found about 1,039 horses in the Complex. PAN_06492. BLM then applied "expected 20% herd growth projected once for 2023 and once more for 2024" to reach 1,465. *Id.* It then subtracted the low AML of 361 to arrive at 1,104. PAN_06461. Roughly 426 of the "excess" horses exist only in the projection. The 20% figure is an assumption. PAN_06461("the BLM assumes"). BLM's own population table does not demonstrate this growth: across the Pancake HMA, Sand Springs West, and Monte Cristo, the estimated population went from 1,372 in 2023 to 1,363 in 2024, with no removals in either year. PAN_06690. BLM's later count of at least 1,263 horses fell below even its 2024 projection. Dkt. 38 at 5. An explanation that "runs counter to the evidence before the agency," and is never reconciled with it, is arbitrary. *State Farm,* 463 U.S. at 43.

**b) The decision authorizes removals with no end date and no new determinations.**

Defendants state that the decision "does not authorize 'maintenance' gathers.'" Dkt. 38 at 14. The record demonstrates otherwise. The Decision Record authorizes gathers and population controls that "will occur until management objectives are obtained." PAN_06453-54. These objectives include "achiev[ing] and maintain[ing] the population within AML range." PAN_06452-53. The HMAP/EA-FONSI describes the Proposed Action the same way: "Once high-end of AML is reached follow-up gathers would occur," and "[f]uture gathers to remove excess wild horses

would be implemented under all alternatives." PAN_06467. The HMAP "will remain in effect until superseded by another document." PAN_06676.[2]

Whether a gather plan may authorize more than one gather is not the question. Dkt. 38 at 13-14. The question is whether BLM may keep removing horses without a new determination. Defendants state that BLM may, "even if the number of horses gathered must go up." *Id.* at 22. But the rule that they quote requires BLM to "base each new necessary-to-remove-excess-animals determination on current information" and not to "ignore material, new information that comes to its attention over time." *Id.* at 23 (quoting *Friends of Animals v. BLM,* 728 F. Supp. 3d 45, 78 (D.D.C. 2024)). Defendants call that decision non-binding. Dkt. 38 at 13. Then they embrace its rule "as exactly what BLM has done." *Id.* at 23.

A different population, larger or smaller, is precisely such information mandating current information. BLM's position converts a single, projection-based finding into a standing license to remove horses indefinitely, beyond anything that was analyzed within the HMAP/EA- FONSI. *See* Dkt. 36 at 19-20, 29-30 (discussing *Friends of Animals v. BLM,* No. 3:15-CV-0057-LRH-WGC, 2015 U.S. Dist. LEXIS 17575, at *2–3 (D. Nev. Feb. 11, 2015) (*"Pine Nut")* (enjoining gather that exceeded the removals the EA analyzed). Defendants do not address *Pine Nut.*

**B. Summary judgment should be granted as to Plaintiffs Second Cause of Action (FLPMA)**

Plaintiffs' Second Cause of Action under the FLPMA is based on Section 706(2)(C) of the APA, which requires courts to set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations." *Id. at* § 706(2)(C). Defendants violated HMAP/EA-FONSI does not conform to the governing land use plans (LUPs) covering the HMA: the 2008 Ely District RMP, the 1997 Tonopah RMP, and the 1986 Humboldt National Forest Land Resource Management Plan (LMRP).  Defendants' failure to confirm to applicable LUPs in managing wild horses in the Pancake Complex exceeds the authority granted by the FLPMA. 5 U.S.C. § 706(2).

---

[2] Defendants fault Plaintiffs' reference to a ten-year structure. Dkt. 38 at 14. The HMAP/EA-FONSI analyzed a "10 year period of the Proposed Action," PAN_06472, but the Decision Record itself sets no end date at all. PAN_06453-54.

**1. Plaintiffs' FLPMA claim is not foreclosed by *Leigh I.***

FLPMA requires that BLM's management actions "shall conform to the approved plan." 43 C.F.R. § 1610.5-3(a); 43 U.S.C. § 1732(a); *see* Dkt. 38 at 14. Defendants answer that the *Leigh I* court found the Complex's plans do not "commit BLM to recalculating the AML in any particular timeframe." Dkt. 38 at 15 (quoting *Leigh I,* 726 F. Supp. 3d at 1228-29). But *Leigh I* did not decide a FLPMA claim. Defendants quote a sentence from the court's NEPA alternatives analysis, addressing whether BLM had to consider raising AMLs, and it rested on a 2022 EA that the court found "properly identified the basis for BLM's decision not to recalculate AMLs." *Leigh I,* 726 F. Supp. 3d at 1229.

Plaintiffs do not ask the Court to impose a timetable for recalculation or to read into FLPMA a duty that is not present within the Wild Horse Act. *Cf.* Dkt. 38 at 16. Instead, Plaintiffs' FLPMA claim rests on conformance with LUPs, and those documents' own terms, which BLM itself invoked to justify this decision. PAN_06462-63, 06470. The Tonopah and Ely RMPs each tie wild horse management to a specific mechanism: a post-gather removal level and monitoring-based AML adjustment. The question is whether this decision applied them. It did not. BLM cannot treat the plans as irrelevant because its own HMAP/EA-FONSI relies on them. PAN_06462-63, 06470.

**2. The HMAP/EA-FONSI does not conform to the Tonopah RMP's three-year removal rule.**

The Tonopah RMP directs BLM "to remove excess wild horses and/or burros to a point which may allow up to three years of population increase before again reaching the appropriate management level…". PAN_00551; *see* PAN_06470 (HMAP/EA-FONSI, invoking this provision to adjust the Sand Springs West AML). BLM's ow n estimates show that Sand Springs West has exceeded its AML of 49 in every year since 2009, including the years after each of its two removals. PAN_06690. As Plaintiffs showed, BLM has never managed the HMA under this rule. Dkt. 36 at 22. Defendants do not respond to that showing. *See* Dkt. 38 at 14-16.

Instead, BLM asserts that the decision complies "with the unambiguous terms" of the governing plans. *Id.* at 14. But where BLM does invoke the Tonopah rule, it misapplies it. The rule

informs BLM how far a gather may reduce a herd: low enough that the herd will take up to three years to grow back to its AML. *See* PAN_00551. It does not change the AML itself.

Applying its assumed 20% annual growth rate, BLM calculated that 28 horses would grow to about 49 in three years, and it made 28 the new low end of a Sand Springs West AML range of 28-49. PAN_06466-67, 06470. That is an AML adjustment and it requires its own site-specific analysis. PAN_01367 (BLM's Handbook); *see supra* Section A.2(c). In fact, the HMAP/EA-FONSI states, "Sand Springs West AML would be *adjusted* to a range of 28-49 wild horses." (emphasis added); PAN_06470. Having invoked a three-year cycle, the decision then abandons it. BLM authorizes follow up gathers whenever the "high end of AML is reached," with no end date. PAN_06467; PAN_06453-54; *see supra* Section A.3(b).

**3. The HMAP/EA-FONSI fails to apply the Ely RMP's monitoring-based adjustment.**

The Ely RMP sets the Pancake HMA's upper AML "based on available habitat" and directs BLM to "[b]ase adjustments to [AML] on monitoring data. PAN_00941-42. Defendants agree that the plan requires AML decisions to be made "on monitoring data," but call this a procedure rather than "an instigating cause." Dkt. 38 at 15, fn. 4. Plaintiffs' claim does not turn on that distinction.

BLM made an AML determination here by concluding that "[c]urrent monitoring results…do not indicate that increasing, evaluating, or revising the AML is warranted." PAN_06453. Under the terms of the Plan, that conclusion had to rest on monitoring data, and yet the HMAP/EA-FONSI. identifies none. Meanwhile, BLM's own assessment, conducted "on a scale of livestock grazing allotments," attributes the Complex's failure to meet Rangeland Health Standards to "livestock grazing management, wild horses, drought, lack of wildfire, insects, invasive species, and road construction.". PAN_06516. Yet, of these seven causes, apart from a single use area ungrazed by cattle, BLM never determines how much each contributes, and then brazenly attributes the problem to horses alone. PAN_06694, 06461; *see* Dkt. 36 at 22-23. Nor does BLM explain what data means for the habitat available to wild horses, the very measure on which the plan bases the upper limit of AML. PAN_00941. BLM's bare statement of conformance is not a showing of it. PAN_06462; *see State Farm,* 463 U.S. at 43.

As in Section A.2(b), Plaintiffs do not ask the Court to order a new AML. They ask that BLM apply its own plan's standard and disclose the basis for its decision.

### C. Summary judgment should be granted as to Plaintiffs' Third Cause of Action (NEPA).

Plaintiffs' Third Cause of Action alleges that BLM violated Section 706(2) of the APA and NEPA when it failed to identify, analyze and provide data and information, including a proper wildfire analysis, basis for AML, baseline conditions, reasonable alternatives, and cumulative impacts. Dkt. 36, pp. 23-28. Additionally, the decision authorizes removals beyond the scope of BLM's NEPA analysis. *Id.* at 29-30.

#### 1. BLM did not complete the wildfire analysis this Court required.

Defendants contend that BLM complied with the *Leigh I* remand, and they agree that the defect there was "the processes by which BLM reaches its final result." Dkt. 38 at 23 (quoting *Leigh I,* 726 F. Supp. 3d at 1226). The question is not whether the revised EA mentions wildfire, but whether BLM supplied a reasoned, site-specific evaluation of competing effects and a supported conclusion about their significance. *See* Dkt. 36 at 24-25. It did not, in three respects.

First, BLM still offers competing possibilities rather than an evaluation. Reducing horses "could result in a theoretical increase in wildfire" from added fire fuels, yet would "theoretically reduce the amount and frequency of future fires" by limiting cheatgrass. PAN_06520. BLM never assesses which effect predominates, how large either is, or over what period. That is the same unanswered question about how "the combined effects" of reduced grazing and invasive spread "would shift risk levels." *Leigh I,* 726 F. Sup. 3d at 1224-25. The HMAP/EA-FONSI elsewhere asserts that wildfire risk "would be reduced," but its own cumulative analysis predicts that "current rates and trends in ignition of wildfires would remain as see[n] in the past. PAN_06521. Defendants' brief does not reconcile the two. It repeats both possibilities and then adopts the favorable one. Dkt. 38 at 23.

Second, the analysis is not specific to the Complex. Beyond general literature, BLM identifies no local vegetation or fuel data supporting either of its predictions: a short-term increase in fuels or a long-term reduction in cheatgrass. Its fire history covers only the Pancake HMA, not

Sand Springs West, Monte Christo, or Jakes Wash, and never enters the effects analysis. PAN_06519. Nor does BLM explain what supports the recovery of native vegetation on which its long-term benefit depends, given the continued livestock use, drought, and existing invasive grasses it elsewhere identifies. PAN_06516.

Third, BLM never reached a conclusion about significance. Defendants say BLM considered wildfire "[i]n weighing the risks posed by each alternative action and explaining its decision to select the Proposed Action." Dkt. 38 at 24. Neither the HMAP/EA-FONSI or the Decision Record sets forth a conclusion. The FONSI offers the blanket statement that "[n]one of the environmental impacts . . . would have significant impact on the human environment." PAN_06771-73. The Decision Record mentions fire only to reject the No Action Alternative and says nothing about the short-term fuel increase BLM predicts from the actions selected. PAN_06454. When Plaintiffs commented that, "[n]o evaluation is made regarding combined effects of changes associated with grazing and the spread of cheatgrass," BLM responded only, "See Section 3.12 Fire/Fuels." PAN_06759 (Comment 52). Defendants invoke deference to BLM's experts but there is no expert conclusion here to defer to. Dkt. 38 at 24. That is the deficiency that required vacatur in *Leigh I.*

**2. BLM may not rely on AMLs it never analyzed.**

**a) BLM cannot tier to AML decisions it never analyzed.**

BLM's tiering defense fails because the Sand Springs West AML is part of the action under review. Dkt. 38 at 21; *see supra* Section A.2(c). BLM cannot avoid analysis because the number originated in a settlement. As Plaintiffs showed, a decision does not escape NEPA review because it takes the form of a consent decree. Dkt. 36 at 26 (citing *Conservation Nw. v. Sherman,* 715 F.3d 1181, 1185 (9th Cir. 2013)).

Plaintiffs do not contend that every document BLM references must have undergone NEPA, or that BLM must analyze AML anew before every gather. *Cf.* Dkt. 38 at 21. This is an HMAP, not only a gather plan, and BLM may not tier to AMLs who basis it cannot identify. For the remaining AMLs outside of Sand Springs West, BLM cannot place them beyond analysis while relying on them as the premise of this action. The excess determination is the AML subtracted from a population projection. PAN_06461. The HMAP/EA-FONSI affirmatively represents that the AMLs

rest on "monitoring data" and "an in-depth analysis of habitat suitability." PAN_06460. BLM concedes this analysis is not in the record. *See* Dkt. 36-5 (Blome Decl. Ex. B); *see supra* Section A.2.

**b) The Department's NEPA procedures confirm that BLM improperly tiered.**

On March 4, 2025, when BLM adopted the HMAP/EA-FONSI, 43 C.F.R. § 46.135 governed tiering. Dkt. 36 at 6 n. 2. The Department's February 2026 NEPA Handbook carries that requirement forward: tiered documents must address site-, phase-, or state- specific conditions rather than rely on a broad programmatic review. Dkt. 36-4 at 304; Blome Decl. Exh. A. An agency's statement of its own procedures is persuasive authority and its weight grows with its "consistency with earlier and later pronouncements." *Skidmore v. Swift & Co.* 323 U.S. 134, 140 (1944). The Handbook does not create a new rule. Instead, it reflects the Department's consistent understanding of what tiering requires and may be looked to for guidance. *See id.* at 140. BLM's reliance on decades-old AML decisions, without any site-specific analysis, was error. *See* PAN_06460.

**c) The Court should take judicial notice of the U.S. Department of the Interior Handbook of NEPA Procedures.**

The Court may notice a fact that "can be accurately and readily determined from sources who accuracy cannot reasonably be questioned." Fed. R. Evid 201(b)(2). Government publications on official websites qualify. *Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 1001 (9th Cir. 2018); *see* Dkt. 36-4 at 3. Plaintiffs move this Court to take judicial notice of an excerpt from the U.S. Department of the Interior Handbook of NEPA Implementing Procedures, February 2026, under Federal Rule of Evidence 201(b). *See* Dkts. 36-4, 36-5, Exh. A. Defendants do not dispute that the Handbook is an authentic Department publication, available on doi.gov. *See* Dkt. 38 at 2 fn. 1. They object only that it post-dates the decision and lacks the force of law. *Id.* Neither objection goes to notice.

As stated above, 43 C.F.R., § 46.135 supplies the source of BLM's tiering obligation, not the Handbook. *Cf. Friends of Animals v. Burgum,* 164 F.4th 738, 750 fn. 2 (9th Cir. 2026) (applying regulations in effect when the decision issued). Defendants cite *Rybachek v. U.S. Env'tl. Prot.*

*Agency*, 904 F.2d 1276, 1296 (9th Cir. 1990) in support of their opposition to judicial notice, but that case bars post-decision information offered "as a new rationalization either for sustaining or attacking the Agency's decision." Dkt. 38 at 2 fn 1. *Rybachek* does not bar an agency's post-decision information, such as an agency's published statement of procedures it was already bound to follow. 904 F.2d at 1296, fn. 25. And whether the Handbook binds BLM goes to its weight, not to whether the Court may notice it. The Court should take judicial notice of Exhibit A to the Blome Declaration.

**3. BLM failed to establish baseline conditions.**

Defendants point to a 2023 census flight and utilization monitoring, in support of monitoring activities. Dkt. 38 at 20-21. But a baseline must allow the agency to "determine what effect the project will have on the environment." *Great Basin Res. Watch v. Bureau of Land Management,* 844 F.3d 1095, 1101 (9th Cir. 2016). BLM fails to support their decision making and explain what removal does to the range.

First, BLM's 2023 "population census" did not "confirm[]" 1,104 excess horses. Dkt. 38 at 20. It estimated 1,039 horses, about 678 above low AML. PAN_06492. BLM reached 1,104 only by projecting 20% growth for two more years, which is a growth rate that its own later estimates do not bear out. PAN_06461, 006492; *see supra* Section A.3(a). The flight in 2023 was only one input into a projection of the number of horses, but it did not confirm the projection.

Second, in response to comments asking BLM to show that past removals achieved a TNEB, and to analyze "other contributing facts such as livestock and climate," BLM responded that the 2012/2013 and 2022 gathers "show a direct correlation with decreased utilization levels on key forage areas." PAN_06752-53 (Comment 39). But BLM's own table does not demonstrate that for the gather, and BLM concedes that "AML has not been achieved following either gather event." PAN_06694 (table), 06753. BLM states that rangeland conditions are continuing "to deteriorate." PAN_06693. Nowhere is livestock or climate addressed. And Defendants state that "7% of original monitoring sites hav[e] been lost with not enough forage species to perform a utilization analysis." Dkt. 38 at 20; But BLM fails to attribute that to a particular cause even though the HMAP/EA-FONSI documents more than 7,000 acres of approved mining operations on the Complex.

PAN_06696, 06694-05. A baseline that cannot state whether past removals worked, or what else is degrading the range fails to show what further removal will accomplish.

**4. BLM's purpose was to adopt an HMAP, but its alternatives only addressed a gather.**

BLM defends the range of alternatives by pointing to the purpose and need of the HMAP/EA-FONSI. Dkt. 38 at 17-19. "[T]he nature and scope of the proposed action" sets the range of alternatives. *Burgum,* 164 F.4th at 755 (9th Cir. 2026) (quoting *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison,* 67 F.3d 723, 729 (9th Cir. 1995)). A narrow purpose permits a narrow range. For instance, a purpose "to gather and remove excess wild horses" did not require alternatives such as seeding or water development. *Wild Horse Educ. v. U.S. DOI,* No. 3:23-cv-00568-ART-CSD, 2025 U.S. Dist. LEXIS 140709, at *25 (D. Nev. July 22, 2025). And a purpose "to provide more ORC capacity" did not require BLM "to reevaluate the system of management of wild horses." *Burgum,* 164 F.4th at 756-57.

Here, the purpose is broader: "to adopt and implement a Herd Management Area Plan (HMAP)" consistent with "BLM policies including the BLM Handbook H-4700." PAN_06462; *see supra* Section A.1. That Handbook requires an HMAP to "formulate a range of alternative management strategies for the herd and its habitat." PAN_01386; *see* Dkt. 36 at 18. An HMAP is the system of management for these herds. Yet, every action alternative BLM set forth is the same removal with different population-control tools. PAN_06466; Dkt. 36 at 18-19. That range fits a gather plan, not the HMAP that BLM set out to adopt.

An agency may reject an alternative only with an adequate explanation. *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1246 (9th Cir. 2005); Dkt. 36 at 27. BLM's explanation for refusing to consider any alternative addressing livestock further confirms that in fact it treated the HMAP as a gather plan. The HMAP/EA-FONSI states that changes to livestock grazing "cannot be made through a wild horse gather decision." PAN_06483. Its explanation was that livestock changes "cannot be made through a wild horse gather decision" and are only possible if BLM first revises the LUPs." *Id; see* PAN_06750-51. Both premises fail. This is an HMAP, not a gather decision. BLM's regulations allow it to close areas to livestock grazing where "necessary to

provide habitat for wild horses or burros, [or] to implement herd management actions." 43 C.F.R. § 4710.5(a); *see* Dkt. 36 at 23. And while an HMAP does not automatically amend a land use plan, a plan amendment need not come first, it can be analyzes with the proposed action. *See* 43 C.F.R. § 1610.5-5. BLM did not have to adopt a livestock alternative. However, it was required to give a valid reason for refusing to consider one.

**5. BLM failed to analyze cumulative impacts on the Complex.**

BLM's cumulative analysis addresses its gather program, not the Complex. *See* Dkt. 36 at 24. A cumulative analysis must consider the action's effects "when added to other past, present, and reasonably foreseeable future actions." PAN_06523. Plaintiffs need not show what those impacts would be, only "the potential for cumulative impact." *Te-Moak Tribe of W. Shoshone v. U.S. Dep't of the Interior*, 608 F.3d 592, 605 (9th Cir. 2010); *see Wild Horse Educ.*, *Wild Horse Educ. v. U.S. DOI,* No. 3:23-cv-00568-ART-CSD, 2025 U.S. Dist. LEXIS 140709, at *27 (D. Nev. July 22, 2025) (applying *Te-Moak*). The CEQ regulation in effect when BLM decided governs. *Burgum,* 164 F.4th at 750 n.2; *cf.* Dkt. 38 at 16.

BLM defined the cumulative-effects areas as "the Pancake Complex" and named "maintaining rangeland health" as a major issue. PAN_06523. BLM's own record shows the potential for cumulative impact on that issue. For instance, gold mining is "on-going…primarily in[the] Pancake Mountain Range," and one mine is moving "from exploration into production." PAN_06526-27. The HMAP/EA-FONSI documents more than 7,000 acres of approved mining operations in the Complex. PAN_06694-95. BLM concedes that past activities "have increased infestations of invasive plans." PAN_06524. BLM states it has closed areas to livestock during drought "to improve range condition." PAN_06525. It reports monitoring sites "lost" without explaining why. PAN_06696; *see supra* Section C.3. These actions impact this decision. They affect eh same rangeland health that BLM attributes to horses. PAN_06461. Yet, BLM's sets forth examples that only address its gather program including holding space, fertility control, and "longer periods of time between gathers." PAN_06526. BLM never evaluates how mining, grazing, and drought combine or impact the removal. In fact, BLM's only statement is a conclusion that predicts "healthier rangelands." PAN_06527. After 6,749 removals over 25 years, BLM still describes

rangeland conditions that "continue to deteriorate" PAN_06525, 06693. BLM did not take the hard look that NEPA requires.

**6. The HMAP/EA-FONSI authorizes removals beyond the scope of BLM's NEPA analysis.**

An EA that analyzes a defined removal cannot authorize later removals of a different scope without new analysis. *Pine Nut,* No. 3:15-cv-0057-LRH-WGC, 2015 U.S. Dist. LEXIS 17575, at *9-10 (D. Nev. Feb. 11, 2015). Removing more horses than BLM analyzed requires a new determination based on current information. *See Friends of Animals v. BLM,* 728 F. Supp. 3d at78-81.

BLM's HMAP/EA-FONSI analyzed the removal of at least 1,104 excess horses. PAN_06461. That figure was a projection and not a count. *See supra* Section A.3(a). Defendants respond that BLM may remove "all excess" horses "even if the number of horses fathered must go up." Dkt. 38 at 22. But the Decision Record authorizes follow-up gathers with no end date and no new determination of excess. PAN_06453-54; *see supra* Section A.3(b). Defendants do not address *Pine Nut.* Removals beyond what the HMAP/EA-FONSI analyzed require new NEPA analysis. Here, the Decision Record improperly authorizes removals without analysis.

**D. Vacatur is the appropriate remedy.**

The APA provides that a reviewing court "shall… hold unlawful and set aside" agency action found to be arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. § 706(2). Where a court holds an agency action unlawful, "[t]he presumptive remedy for violations of NEPA and the Administrative Procedure Act is vacatur." 350 *Montana v. Halland,* 50 F.4th 1254, 1259 (9th Cir. 2022). Courts only retain "equitable consideration in 'limited circumstances' to remand a decision without vacatur while the agency corrects its errors." *Mont. Wildlife Fed'n v. Haaland,* 127 F.4th 1, 50 (9th Cir. 2025) (*quoting Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015)).

Instead of addressing Plaintiffs' request for vacatur of the HMAP/EA-FONSI and Decision Record, Defendants rely on *Winter v. NRDC Inc.,* a preliminary injunction case. 555 U.S. 7, 21 (2008); Dkt. 38 at 24. But Plaintiffs do not seek a preliminary injunction, and vacatur requires no

showing of the *Winter* factors. Should the Court conclude that an injunction is warranted beyond vacatur, Plaintiffs do not oppose the supplemental briefing Defendants request. Dkt. 38 at 24.

## III. Conclusion

Plaintiffs respectfully act this Court to grant summary judgment based upon Defendants' violation of the APA, Wild Horse Act, FLPMA, and NEPA; deny Defendants' cross-motion; and, vacate the HMAP/EA-FONSI and Decision Record. This is a challenge to the adequacy of BLM's analysis, not a disagreement with its policy choices. An HMAP is not a gather plan under another name. It is mandated that an HMAP perform the management function BLM's regulations and Handbook assign it. The Wild Horse Act protects these herds "as an integral part of the natural system of the public lands," and BLM may not remove them on numbers it cannot explain, under a plan that exists in name only.

DATED: November 24, 2026

Respectfully Submitted,

*<u>/s/ Jessica L. Blome</u>*
Jessica L. Blome
(Cal. Bar No. 314898, pro hac vice)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2026, I electronically filed and served the foregoing with the Clerk of the Court for the United States District Court for the District of Nevada using the CM/ECF system, which will send notification of this filing to the attorneys of record.

*/s/ Jessica L. Blome*
Jessica L. Blome